[No. 85992-2.    En Banc.]
Argued June 26, 2012.      Decided September 6, 2012.

*In the Matter of the Personal Restraint of* Charles Walter
Weber, *Petitioner.*

*Michael C. Kahrs* (of *Kahrs Law Firm PS*), for petitioner.

*Daniel T. Satterberg, Prosecuting Attorney for King County*, and *Ann M. Summers, Deputy*, for respondent.

*Todd Maybrown* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae.

¶1 C. JOHNSON, J. — This case involves a time-barred personal restraint petition (PRP) and requires the court to determine whether the petitioner has made a prima facie showing of a gateway actual innocence claim. If the petitioner presents sufficient evidence to support such a claim, the time limit on the PRP would be equitably tolled to permit consideration of the merits of the constitutional claim. This case also requires the court to adopt a standard for reviewing gateway claims where the petitioner claims actual innocence of a conviction.

¶2 Petitioner Charles Weber filed an untimely PRP, asserting that he received ineffective assistance of counsel when his attorney failed to conduct a reasonable investigation of the case and failed to explore the possibility that he had been misidentified as the perpetrator. Weber seeks to avoid the procedural time bar by arguing that the actual innocence doctrine, recognized by this court in *In re Personal Restraint of Carter*, 172 Wn.2d 917, 263 P.3d 1241 (2011), be applied to allow review of his constitutional claim. Weber supports his innocence claim with new evidence in the form of declarations. Although the State's case at trial was circumstantial, the new evidence Weber presents is insufficient to show he is factually innocent. Accordingly, we dismiss Weber's PRP.

## FACTS

¶3 The facts are related in some detail as this case essentially requires us to evaluate the evidence presented at trial against the new evidence supporting Weber's claim of actual innocence.

¶4 Early morning on March 18, 2003, law enforcement responded to a report of a bullet-riddled sport utility vehicle (SUV). Gabriel Manzo Vazquez, the vehicle's owner, reported the shooting took place when he was attending a party at the apartment of his friend, Rhonda Encinas. While at the party, Vazquez met three men: Nick Renion, "Andreas," and a man who went by the moniker "Guero Loco." He and Renion began arguing, and at some point during the argument, Guero Loco pulled a semiautomatic handgun on Vazquez. Vazquez ran into a bedroom where Victor Garcia-Rodriguez was watching television. Vazquez jumped out of the bedroom window and ran to his car. Vazquez alleged that Guero Loco shot at him several times as he drove away. One of the bullets grazed his abdomen.

¶5 Vazquez described Guero Loco as a white male in his 20s, about five feet six inches tall, very skinny, and with a shaved head. Vazquez also described Guero Loco as having a "206" tattoo on the back of his neck, though he did not describe the size of the tattoo. Based on this information, a deputy looked through the department's database for anyone named "Guero Loco." Not finding a record of anyone with that name, the deputy entered the term "loco," resulting in a list of 10 or 12 names. He found petitioner Weber associated with the term "Weta Loco" and also determined that Weber had a "206" tattoo on the back of his neck. Clerk's Papers (CP) (June 10, 2003) at 111 (*State v. Weber*, No. 77395-5 (Wash. Dec. 28, 2006)). The deputy opined that "Wedo Loco" and "Guero Loco" were the same. CP at 110-11.

¶6 Later that same day, another deputy stopped Weber for failing to stop at a stop sign. Weber was driving a gray

sedan. The deputy noticed Weber had "LOCO" tattooed across his fingers and "206" tattooed on the back of his neck. "Wedo Loco" was also tattooed on the side of Weber's neck. After confirming probable cause for arrest, the deputy arrested Weber. A search of the car incident to the arrest uncovered "baggies" of cocaine. A subsequent search of the car uncovered information regarding Rhonda Encinas.

¶7 Weber was interviewed at the sheriff's office and was informed that he had been arrested for a shooting at a party. Weber claims he assumed he was arrested for drugs. He declined to give a statement and was transported to the King County jail. Weber's booking photo shows that he had short dark hair, was five feet seven inches tall, and weighed 165 pounds.

¶8 Vazquez was shown a photo montage. He selected Weber with 80 percent certainty but could not be sure without seeing the tattoos.

¶9 Garcia-Rodriguez, whose bedroom Vazquez fled through, was interviewed by a detective at Encinas's apartment the next day. He permitted the detective to examine the apartment and take photographs. Garcia-Rodriguez stated that Weto Loco[1] was at the party that night but did not see Weto Loco with a gun. He also stated the shooter left in a gray car. He identified Weber from a photomontage. Garcia-Rodriguez did not testify at trial.

¶10 A detective spoke with Encinas the following day. She was uncooperative and provided no useful information. Encinas was served with a subpoena to appear for trial. Although the detective obtained a material witness warrant, Encinas was not apprehended on the warrant and she never showed up to testify.

¶11 The State did not locate or interview Renion even though he was considered a possible accomplice and was arrested on an unrelated matter during the investigation.

---

[1] This spelling is found in the transcript of the interview; Garcia-Rodriguez did not provide this spelling. State's Resp. to Pers. Restraint Pet., App. D.

"Andreas" was also not located or interviewed even though he was reported to be Encinas's and Renion's cousin. The sheriff's office neither searched Weber's residence nor sought to have him tested for gunpowder residue. The firearm in this case was never found.

¶12 The State charged Weber with attempted first degree murder, first degree assault, first degree unlawful possession of a firearm, and unlawful possession of cocaine with intent to deliver. Weber pleaded guilty to the cocaine charge before trial on the other charges. Weber asserts that defense counsel urged him to accept a plea on the shooting charges but that he refused because he was innocent. Defense counsel interviewed Vazquez but did not interview Encinas or Renion. He did not locate or interview Andreas. Weber asserts that while his attorney mentioned Renion to him, he did not mention the name Andreas.

¶13 Vazquez was the only direct eyewitness to the shooting to testify at trial. He testified that he arrived at Encinas's house around 8:00 p.m. and the shooting occurred sometime between 3:30 a.m. and 5:00 a.m. Vazquez testified that the shooter went by the nicknames "Guero Loco" and "Boxer" and that he had met him once before at Encinas's apartment. He testified that Guero Loco left the party about a half hour after arriving. Guero Loco then returned, staying at the party until the shooting.

¶14 According to Vazquez, there were six people in the apartment at the time of the shooting: himself, Encinas, Renion, Guero Loco, Andreas, and Garcia-Rodriguez. Vazquez admitted he had had about nine beers but was not drunk. He and Renion got into an argument, and Encinas tried to intervene but was pushed aside. Vazquez testified that Guero Loco then pulled out a semiautomatic handgun, pointing it at him. Vazquez stated he ran to the bedroom and then jumped out of the window to get to his car. He stated he was backing up his vehicle when Guero Loco ran downstairs. Vazquez testified that he saw Guero Loco load a magazine into the gun with his right hand, while holding

the gun with his left hand, and that Guero Loco then started shooting at him, with one of the bullets hitting his stomach.

¶15 Vazquez testified that he was 80 percent certain that the man he picked from the photomontage, Weber, was the shooter. He said he could not be sure without seeing the tattoo on his neck. Vazquez identified Weber in the courtroom, testifying he was the shooter. But Vazquez noted that Weber's hair was different. During closing arguments, defense counsel reminded the jury that Weber's hair was the same at trial and in the photomontage.

¶16 Jennifer Martini testified for the State, stating she called 911 on March 18, 2003, around 3:00 a.m. after she heard gunshots from her balcony. She testified that she saw a dark SUV driving away, and a few minutes later she saw a second vehicle, a light colored, four-door sedan, follow the SUV. The State admitted exhibits of Vazquez's SUV and Weber's gray sedan. Martini identified the SUV as the first vehicle she saw on the night of the shooting, and she testified that the gray sedan was similar to the second vehicle she saw that night.

¶17 Stephanie Fisher, Weber's cousin and alibi witness, testified that Weber was with her all night. The State impeached her with a previous conviction for impersonation and inconsistencies between her trial testimony and her interview the detective.[2] She then testified that Weber went out twice that evening. Fisher attributed her inconsistent statements to the detective's intimidating behavior. She also explained that there was a portion of her interview that was not recorded and that she had had her 15-month-old baby on her lap during the entire interview.

¶18 The jury found Weber guilty of the lesser degree crime of attempted second degree murder, first degree

---

[2] During her interview with the detective, Fisher initially stated Weber was with her all evening. But after the detective warned Fisher about the risk of being found guilty of perjury and that such a conviction could be used against her in her child custody battle, Fisher admitted Weber went out a couple of times during the evening.

assault, and first degree unlawful possession of a firearm. The trial court vacated the assault conviction on double jeopardy grounds. On direct appeal the Court of Appeals reversed, holding that the trial court should have vacated the attempted second degree murder conviction instead. *State v. Weber*, 127 Wn. App. 879, 112 P.3d 1287 (2005), *aff'd*, 159 Wn.2d 252, 149 P.3d 646 (2006). On remand, the trial court imposed a sentence for the first degree assault conviction. Weber filed a PRP in the Court of Appeals, which was dismissed. *In re Pers. Restraint of Weber*, No. 60449-0-I (Wash. Ct. App. Mar. 21, 2008). We denied discretionary review of that dismissal.[3] *In re Pers. Restraint of Weber*, No. 81579-8 (Wash. Sept. 29, 2008).

¶19 More than one year after the judgment and sentence became final, Weber filed the instant PRP in this court. Weber maintains he is innocent of his first degree assault and firearm conviction and claims defense counsel was ineffective. The petition is supported by several declarations.

¶20 Consideration of Weber's petition was stayed pending our decision in *Carter*, 172 Wn.2d 917. That decision is now final. In *Carter* we recognized "actual innocence" as a form of equitable tolling of the time limit on personal restraint petitions. *Id.* at 920. In light of *Carter*, Weber contends that based on the new evidence supporting his innocence, this court should equitably toll the statutory one year time limit on his PRP to consider his constitutional ineffective assistance of counsel claim. He also contends we should recognize a constitutional freestanding claim of actual innocence.[4]

¶21 We granted review of Weber's PRP.

---

[3] While serving his sentence, Weber was convicted of second degree assault against another inmate and sentenced as a persistent offender to life without the possibility of early release. *State v. Weber*, 137 Wn. App. 852, 155 P.3d 947 (2007). This case involves a challenge to one of Weber's strike offense convictions.

[4] Washington Association of Criminal Defense Lawyers filed an amicus brief in support of Weber's proposal that this court recognize a freestanding actual innocence claim.

## ISSUES

¶22  1. Whether Weber has made a threshold showing of a gateway actual innocence claim such that the time limit on his petition should be equitably tolled to permit consideration of whether defense counsel was ineffective.

¶23  2. Whether this court should recognize a freestanding actual innocence claim.

## ANALYSIS

*1. Gateway actual innocence claim*

*A. Standard of review*

¶24  As mentioned, Weber filed his PRP more than one year after his judgment and sentence became final. Ordinarily his petition would be time barred unless he can show the judgment and sentence is facially invalid or otherwise rendered by a court lacking jurisdiction, RCW 10.73.090(1), or he asserts only grounds for relief that are exempt from the time bar under RCW 10.73.100. In general terms, these grounds include (1) newly discovered evidence, (2) the statute that the defendant was convicted of violating was unconstitutional, (3) the conviction was barred by double jeopardy, (4) the evidence introduced at trial was insufficient to support the conviction, (5) the sentence imposed was in excess of the court's jurisdiction, or (6) there was a significant change in the law that was material to the conviction or sentence and the law applies retroactively. *See* RCW 10.73.100.

¶25  But as this court recently recognized in *Carter*,[5] in the context of an untimely challenge to a noncapital

[5] After *Carter* was final, we granted the State's motion for supplemental briefing to discuss the scope and application of the actual innocence doctrine to this case. After supplemental briefing was filed by both parties, Weber filed a motion to strike portions of the State's brief, which we passed to the merits. Weber contends that the State's arguments went beyond the legal issues in *Carter* and improperly included new evidence. All of the State's arguments relate directly to

persistent offender sentence and where a petitioner can meet the high burden of showing that he or she is actually innocent, procedural hurdles should not prevent review of constitutional claims. This is based on the principle that incarcerating one actually innocent of a crime or sentence is a fundamental miscarriage of justice. However, because of our respect for finality of judgments and statutory procedures governing PRPs, equitable tolling under the actual innocence doctrine remains a very narrow exception applied only in circumstances where justice requires. Such a claim generally should not be used in place of the statutory exceptions or exemptions to the time bar provided in RCW 10.73.090.[6]

¶26 There are two forms of an actual innocence claim. The first are freestanding constitutional claims of actual innocence, in which innocence itself provides a basis for relief. The second are so-called "gateway" claims used to avoid procedural time bars so that a court may review other claimed constitutional errors. *Schlup v. Delo*, 513 U.S. 298, 315, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995); *Carter*, 172 Wn.2d at 923-24. Weber asserts both forms as alternative

---

the legal issues raised in *Carter* and thus were proper. Because the State's new evidence is irrelevant to our analysis, there is no need to determine whether the new evidence is improperly before us.

[6] To ensure that the actual innocence doctrine is used only as a narrow exception to the time bar, in *Carter* we also embraced the avoidance principle adopted by the United States Supreme Court. The avoidance principle prohibits consideration of an actual innocence claim unless all other claimed exceptions to the time bar have been addressed. *Carter*, 172 Wn.2d at 929 (citing *Dretke v. Haley*, 541 U.S. 386, 393-94, 124 S. Ct. 1847, 158 L. Ed. 2d 659 (2003)). Here, Weber also claims relief under the newly discovered evidence exemption under RCW 10.73.100(1), relying on the same declarations used to support his actual innocence claim. These declarations were submitted by experts or Weber's acquaintances with the purpose of showing Weber had been misidentified as the shooter. But none of the evidence contained in the declarations qualifies as newly discovered. All of the evidence could have been discovered before trial had his attorney exercised reasonable due diligence. *See State v. Macon*, 128 Wn.2d 784, 799-800, 911 P.2d 1004 (1996) (explains five factors that must be proved to be newly discovered evidence). Indeed, that his attorney failed to conduct a reasonable investigation into his claimed innocence is the argument underlying Weber's ineffective assistance of counsel claim.

grounds for relief. We address his gateway actual innocence claim first.

¶27 Gateway actual innocence claims have been asserted two ways: a petitioner claims actual innocence of the crime he or she was convicted of, or claims actual innocence of a sentence enhancement. In federal habeas courts, the type of actual innocence claim asserted dictates which standard will be used to evaluate the claim. When evaluating claims in the context of a sentence enhancement, federal habeas courts require petitioners show "by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible" for the sentence received. *Sawyer v. Whitley*, 505 U.S. 333, 348, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992). We embraced this standard in *Carter* where the petitioner claimed actual innocence of his persistent offender sentence. *Carter*, 172 Wn.2d at 924.

¶28 But unlike Carter, Weber claims he is actually innocent of his assault and firearm conviction.[7] Where a petitioner claims innocence of a conviction to overcome a procedurally barred habeas corpus petition, the United States Supreme Court in *Schlup* held a less stringent standard applies. There, petitioner Schlup was prosecuted for killing a fellow prison inmate. The State primarily relied on the testimony of two corrections officers who had witnessed the killing. The State produced no physical evidence connecting Schlup to the killing. Schlup's defense was that another person committed the murder. He relied on a surveillance videotape from a camera in the prisoners' dining room. Schlup appeared on the tape, walking at a normal pace, 65 seconds before prison guards were seen rushing to the murder scene. Thus, the case largely turned on whether Schlup had enough time to commit the crime from the moment he left his cell to the time he was recorded

---

[7] As mentioned, Weber is currently serving a life sentence as a persistent offender and this case involves a challenge to one of his strike offenses. Because his innocence claim is brought in this context, we do not determine whether such a claim would be permitted outside the context of a capital sentence or a noncapital persistent offender sentence.

on the videotape. Schlup was convicted and sentenced to death. *Schlup*, 513 U.S. at 301-05.

¶29  After Schlup had exhausted his direct appeals and after a first habeas petition was denied, he filed a second petition asserting a gateway actual innocence claim based on ineffective assistance of counsel and the prosecution's failure to disclose exculpatory evidence. To support the actual innocence claim, Schlup provided declarations of several inmates proclaiming he was innocent. The inmate who sent out an emergency call provided a declaration confirming that he had sent the call shortly after the killing. This tended to demonstrate that Schlup was in front of the camera when the murder was committed. Another inmate stated he saw the assault and Schlup was not involved. And a former prison guard, who heard about the case and came forward, stated he encountered Schlup at about the time of the assault and that Schlup walked at a leisurely pace and was not perspiring, not breathing hard, and did not seem nervous. *Schlup*, 513 U.S. at 308-12. The district court and the Court of Appeals, applying the "clear and convincing" standard, denied the petition after concluding Schlup had not met that burden.

¶30  The United States Supreme Court reversed, holding that the less stringent probability standard applied. Under the probability standard, the petitioner is required to show that in light of new evidence "it is more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327 (citing *Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). This considers "what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329. To be credible, a gateway actual innocence claim requires the petitioner to support his allegations with new, reliable evidence. This may include exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial. New evidence in this context does not mean "newly discovered"

but rather "newly presented" evidence. *See Schlup*, 513 U.S. at 324.

¶31 To the Court, a petitioner should have a lesser burden when asserting a gateway innocence claim. It reasoned such a claim of innocence is based on an assertion of a constitutional error at trial. Because of that, the conviction was not entitled to the same degree of respect as one from a constitutionally error-free trial or where constitutional errors occurred but are deemed harmless. In evaluating the actual innocence claim, the Court noted that the affidavits Schlup presented were particularly relevant— they were submitted by black inmates attesting to the innocence of Schlup, a white defendant, in a racially motivated killing. *Schlup*, 513 U.S. at 316. In light of Schlup's compelling new evidence and after concluding that the lower courts had applied the wrong standard to Schlup's actual innocence claim, the Court remanded the case to the district court for further proceedings.

¶32 We agree with the United States Supreme Court that a petitioner claiming he was convicted based on a constitutionally flawed trial warrants application of a less stringent standard. Like Schlup, here, Weber claims he is actually innocent of his conviction but that he was found guilty because his trial was tarnished by a constitutional error, that is, he was denied effective assistance of counsel. That Weber possibly received ineffective assistance could undermine confidence in the trial itself. This assertion is markedly different from one where a petitioner disputes his or her sentence but not conviction—unlike Carter who was factually guilty of his underlying conviction, Weber claims he is innocent of the crime. Thus, as clarified in *Schlup*, we adopt and apply the probability standard when considering a gateway actual innocence claim in the context of a conviction.

*B. Weber's gateway actual innocence claim*

¶33 Applying the probability standard, we must determine whether Weber presents sufficient evidence to

make a threshold showing of innocence. Under the probability standard, after evaluating the new reliable evidence in light of the evidence presented to the jury, a court must be persuaded that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.

¶34 The strongest evidence presented to the jury against Weber at trial was the "206" tattoo tied to Vazquez's eyewitness identification. The State also presented evidence through Martini's testimony that a gray car, resembling Weber's, was seen following Vazquez's SUV after gunshots were heard. The State also presented evidence that Encinas's information was found in Weber's car. From this, a reasonable juror could have inferred that Weber and Encinas knew each other. The State, however, presented no physical evidence tying Weber to the shooting. The State was also aware of four eyewitnesses present in the apartment at the time of the shooting, Encinas, Renion, Andreas, and Garcia-Rodriguez, but none of these witnesses testified.

¶35 Although Vazquez testified that "Guero Loco" also went by "Boxer," the State presented no evidence tying Weber to the "Boxer" nickname. Vazquez also reported that the shooter had a shaved head, which Weber certainly did not have. His booking photo, taken the same day as the shooting, shows he had dark hair about a half inch to an inch long. At trial, Vazquez testified that Weber's hair looked different. But as defense counsel pointed out during closing argument, Weber's hair was the same at trial and in his booking photo. Moreover, Vazquez's testimony indicated that the shooter used his left hand to shoot. Weber claims he is right-handed. And although the "206" tattoo identification evidence is strong, a detective's testimony implied he

had seen other persons with that tattoo on the back of their necks.[8]

¶36 Yet, despite that the State's case was based on circumstantial evidence, the new evidence Weber presents does not make it "more likely than not" that no reasonable juror would have found him guilty. Weber's evidence suggests that he was misidentified but is insufficient to make a prima facie showing of actual innocence. The declaration by Dr. Geoffrey Loftus on the eyewitness identification focuses on general principles of eyewitness identification and questions the reliability of Vazquez's identification in this case. But as the State contends, even with that information, a juror could still find Vazquez correctly identified Weber because (1) Vazquez briefly met Guero Loco once before and because (2) of the "206" tattoo. This identification was made even stronger when corroborated with Martini's testimony. Weber also submitted a declaration provided by a gun expert, who states it is unlikely that a right-handed person could shoot a gun accurately with his or her left hand. But this evidence does nothing to discount the possibility that Vazquez was mistaken that the shooter was left-handed or that Weber could have used his left hand to shoot even though he claims he is right-handed.

¶37 Scott Meth claims in his declaration that he was at the party before the shooting and that a light-skinned, bald, and tattooed person known as "Guero Loco" or "Boxer," who resembled Weber, was also there. Another declaration submitted by Brian Strickland corroborates the claim that there is a person, not Weber, who went by the name "Guero Loco" or "Boxer." But even if true, these facts still leave open the possibility that Weber was at the party. Vazquez testified that Guero Loco left the party and returned later in the

---

[8] The State argues that Garcia-Rodriguez's recorded interview cuts against Weber's claim that he is actually innocent. But the State failed to secure Garcia-Rodriguez as a trial witness. As mentioned, the standard focuses on the evidence presented to the jury and the new evidence. Because Garcia-Rodriguez's investigation interview was not offered to the jury, we decline to consider his statements.

night. A reasonable juror could have found this consistent with Fisher's testimony that even though Weber was with her on the night of the shooting, he left twice.

¶38 Perhaps the best evidence Weber presents is the declaration submitted by Andrew Larson. Larson claims he was at the party when the shooting occurred and states he is "positive" Weber was not at the party. Unlike in *Schlup*, where the supporting affidavits were submitted by persons who had no relationship with the defendant, here, Larson has been friends with Weber since the sixth grade. While Weber argues that credibility issues could be resolved in a reference hearing, Weber cannot make a threshold showing of innocence to warrant such a hearing. When weighing his new evidence in light of Vazquez's identification, Martini's testimony that the car she saw driving away resembled Weber's, and the gaps in Fisher's alibi testimony, we are not persuaded that it is more likely than not that no reasonable juror would have found Weber guilty.

### 2. Freestanding actual innocence claim

¶39 Weber also seeks recognition of a constitutional, freestanding actual innocence claim. Such a claim is asserted as an independent basis for relief from a conviction free of any constitutional errors. The United States Supreme Court has not explicitly adopted a constitutional freestanding claim of actual innocence even in a capital punishment context. *See Herrera v. Collins*, 506 U.S. 390, 417, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (federal habeas relief *may* be available in a capital case if there were no state avenue open to hear such a claim and petitioner can meet an "extraordinarily high" burden of showing actual innocence, but petitioner could not make such a showing). Several states have adopted a freestanding actual innocence doctrine under state constitutional principles but vary in the standards used to evaluate such claims. Nonetheless, any standard by which a freestanding actual innocence claim must be proved will be higher than that

applied in the gateway context. Weber, however, fails to make a prima facie showing of a gateway actual innocence claim. Thus, even if we were to recognize a freestanding claim, which we decline to do at this time, Weber necessarily cannot succeed on a freestanding innocence claim.

## CONCLUSION

¶40 We conclude that the petitioner has not met the burden of establishing a gateway actual innocence claim and dismiss the petition.

MADSEN, C.J., and CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, STEPHENS, WIGGINS, and GONZÁLEZ, JJ., concur.

Reconsideration denied October 19, 2012.