**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE**

| | |
|---|---|
| IN THE MATTER OF THE PERSONAL RESTRAINT OF:<br><br>STEPHEN PAUL KOZOL,<br><br>                     Petitioner. | No. 84098-3-I<br><br>ORDER GRANTING MOTION TO PUBLISH |

The respondent, State of Washington, and a third party, Pierce County Prosecuting Attorney, having filed motions to publish opinion, and the hearing panel having reconsidered its prior determination and finding that the opinion will be of precedential value; now, therefore it is hereby:

ORDERED that the unpublished opinion filed April 1, 2024, shall be published and printed in the Washington Appellate Reports.

For the Court:

_Feldman, J._

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| IN THE MATTER OF THE PERSONAL RESTRAINT OF:<br><br>STEPHEN PAUL KOZOL,<br><br>               Petitioner | No. 84098-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. – In 2001, Stephen Paul Kozol was convicted of attempted first degree murder and first degree burglary and sentenced based on an incorrectly calculated offender score. In 2020, Kozol was resentenced with a correctly calculated offender score. Kozol now claims that the 2020 resentencing allows him to challenge his 2001 conviction despite the one-year time limit for filing a personal restraint petition (PRP) under RCW 10.73.090. We reject Kozol's various attempts to avoid the one-year time limit and dismiss his PRP as untimely.

**I**

In a prior opinion regarding Kozol's 2001 judgment and sentence (the 2001 J&S), we recounted the relevant facts and procedural history as follows:

> Steven Kozol and Thomas Wolter were housemates in Wolter's home from November 1999 to May 2000. Wolter was financially stable, whereas Kozol seldom worked. Kozol owed three months' rent when he moved out of Wolter's home.
>
> Six months later, on November 15, 2000, Wolter was violently attacked in his home by a man wearing a black ski mask over his

head and face, leather gloves, and a thick gray sweat suit. Wolter fought his assailant in the upstairs office of his home where the initial attack occurred, then in the stairwell and at the bottom of the stairs, then back upstairs at the doorway to Wolter's bedroom after Wolter ran upstairs and tried to barricade himself in the bedroom and the assailant returned up the stairs and attempted to kick in the door, then back down the stairwell and into the lower part of the house where Wolter was finally able to break away and run to a neighbor's home. In the course of the attack and the ensuing struggle, Wolter was shot with a taser gun, shot three times with a handgun, and threatened with a knife.

Wolter's neighbor called 911. Police arrived quickly but were unable to locate the assailant. Wolter was taken to Harborview Hospital where he was treated for the gunshot wounds and for numerous lacerations requiring stitches. Wolter was not able to identify his assailant, but he was able to describe the clothing worn by the man, and gave police a general description of the man's height, weight, and build. He also told police that when he was shot with the gun he heard a "popping" or "puff" noise, and that the gun seemed to have something long attached to it. This led police to believe that the gun had been equipped with a silencer.

The officers obtained a search warrant to search Wolter's home for evidence. They found no sign of forced entry. They found bloodstains on the carpet and walls, bullets and bullet holes, a wire from a taser gun, a taser barb on the jacket Wolter had been wearing, and "AFIDS" on the floor of the office. The acronym AFIDS stands for "anti-felon identification tags." They are automatically deployed when a taser gun is fired, and they have a serial number on them that can be traced back to a specific taser gun. In this case, the AFIDS were traced to a taser gun that had been purchased by Wolter's former housemate Steve Kozol, eight days before the attack, from a business called Spy Connection. The physical description Wolter gave police of his attacker was similar to that of Kozol.

The bullets retrieved from the crime scene were found to have been shot from a 9 mm. semi-automatic or fully automatic pistol manufactured by SWD Company. This company imprints the logo "Cobray" on the firearms that it manufactures. Police subsequently found evidence that Kozol had purchased a 9 mm. Cobray handgun and a rapid-fire attachment for the gun.

Because the AFIDS had been traced to a taser gun purchased by Kozol, police promptly began watching him. They saw him transfer

a briefcase from his Audi vehicle into the trunk of a Mustang owned by his girlfriend. They obtained multiple search warrants to search Kozol's residence, a storage facility that he rented, his Audi, and his girlfriend's Mustang. In the Mustang, police found a briefcase containing Wolter's identification, several bank statements and blank checks belonging to Wolter, a newspaper article about the attack on Wolter, and a business card from the business called Spy Connection. Wolter subsequently identified the briefcase as one belonging to him.

Police found a book entitled Quick and Dirty Home Made Silencers in Kozol's Audi. They also found "smear transfer" bloodstains on the driver's seat of the car. Swabs were taken, tested, and found to exactly match a blood sample taken from Wolter.

In Kozol's garage, police found parts that could be used to make home made silencers for guns using some of the methods described in the book on how to make silencers that was found in Kozol's Audi. Detective Gulla, who helped execute the search warrant for Kozol's garage, subsequently testified that based on his training and experience with firearms and silencers, including actual experience in making a home made silencer, he immediately recognized the parts that he saw in the garage as those from which silencers can be made. He also testified that these parts were located in close proximity to one another.

Kozol was charged with attempted murder in the first degree, and in the alternative, with attempted murder in the second degree. He was also charged with burglary in the first degree. Each of the charges included an allegation that Kozol was armed with a deadly weapon at the time of the crimes.

Kozol brought a motion to suppress evidence obtained from only one of the several search warrants that were issued, the warrant which authorized the search of Kozol's house, garage, and car. The court denied the motion to suppress.

At trial, Kozol testified that although he had indeed purchased a taser gun, a 9 mm. Cobray handgun, and a rapid-fire attachment for the gun, these items had been stolen from his rented storage locker before the night of the crime against Wolter. He testified that he had intended to give the taser gun to his girlfriend for Christmas, and that he had intended to use the handgun for target practice. He testified that the blood on his car seat could have come from a rag that he had used to treat a foot injury Wolter received when he stepped on a nail, which rag he had tossed into his car. He testified that Wolter

gave him the briefcase, and that because the two had shared the office on the second floor of Wolter's home while they were housemates, Wolter's identification, blank checks, and bank statements, which predated the crime by several months, could have been accidentally swept into the briefcase when Kozol moved out. He denied any involvement in the attack on Wolter. Both he and his girlfriend testified that on the night of the attack, Kozol had been with the girlfriend at her home the whole time. Kozol explained that the parts in his garage were for his hobby of building homemade rockets and for a business project of developing a new kind of air filter for diesel trucks. He also claimed to be writing a novel that included spies and taser guns.

Wolter testified during rebuttal that he had no recollection of injuring his foot by stepping on a nail, or of giving Kozol his briefcase, but that the happening of either event was in the realm of possibility.

The jury found Kozol guilty of attempted first degree murder and first degree burglary, and also found that he had been armed with a deadly weapon at the time of each offense.

*State v. Kozol*, noted at 117 Wn. App. 1037, 2003 WL 21500724, at *1-3. The trial court then sentenced Kozol. Critical here, the court *incorrectly* calculated an offender score of 9 on the attempted murder count, sentenced Kozol within the standard range for that *incorrect* offender score, and imposed two firearm sentence enhancements.

Kozol timely appealed the trial court's judgment and sentence. This court affirmed the judgment and sentence on direct appeal, and the Washington Supreme Court denied review. 2003 WL 21500724, at *10; *State v. Kozol*, 150 Wn.2d 1037, 84 P.3d 1230 (2004). On February 25, 2004, this court issued its mandate. At that time, the 2001 J&S was judicially final and no longer subject to direct review.

In 2005, Kozol filed a motion under CrR 7.8 for collateral relief from the 2001 J&S, which was transferred to the Court of Appeals as a PRP. Kozol argued the

trial court incorrectly calculated his offender score by including two prior convictions for forgery and theft from 1991 that should have "washed out" under former RCW 9.94A.360(2).[1] This court rejected Kozol's argument based on the limited record presented in support of the PRP.

In 2018, Kozol filed a second motion under CrR 7.8 asserting the same argument as his first motion but, this time, he presented compelling evidence showing that his 1991 convictions should have washed out. The court agreed with Kozol's argument that the 2001 J&S was facially invalid because it was based on an incorrect offender score. The trial court resentenced Kozol within the standard range based on a *corrected* offender score of 7 on the attempted murder count and again imposed two firearm sentence enhancements. The trial court issued its amended judgment and sentence in 2020 (the 2020 J&S). Kozol timely appealed the 2020 J&S, and the Court of Appeals, upon motion by Kozol, dismissed the appeal on June 8, 2021.

Finally, on June 1, 2022, Kozol filed the instant PRP challenging his convictions on six grounds: (1) prosecutorial misconduct, (2) erroneous admission of evidence, (3) newly discovered evidence and/or improperly suppressed *Brady*[2] evidence, (4) destruction of exculpatory evidence, (5) ineffective assistance of

---

[1] Under the "washout" provision of former RCW 9.94A.360(2) in effect when Kozol committed his crimes in 2000, prior class C felony convictions were not included in the offender score if "since the last date of release from confinement . . . the offender had spent five consecutive years in the community without committing any crime that subsequently results in a conviction." Washington courts refer to these convictions as having "washed out." *E.g.*, *State v. Gauthier*, 189 Wn. App. 30, 40, 354 P.3d 900 (2015).

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

counsel, and (6) denial of access to the courts.[3]  The State, in response to the PRP, asserts that we need not reach any of Kozol's arguments because the PRP is untimely and must therefore be dismissed.

## II

Our Supreme Court described the proper role of PRPs in safeguarding the fair trial rights of defendants in *In re Personal Restraint of Coats*, 173 Wn.2d 123, 267 P.3d 324 (2011).  The court explained, "The defendants' right to a fair trial is protected by a right of direct appeal.  After the right of appeal has been exhausted and the appeal is final, the defendant is afforded the additional right to collateral review by a personal restraint petition."  *Id.* at 140.  But the court added that this right to collateral review "is not unlimited."  First, "It requires the petitioner to make a heightened showing of prejudice, among many other things."  *Id.*  And second, "Personal restraint petitions based upon most claimed errors made at trial by the judge such as jury instructions and rulings on evidence and motions, must be brought within the one-year time limit prescribed by RCW 10.73.090."  *Id.*[4]

---

[3] Although Kozol also claims he is challenging his firearm enhancements, PRP 1, he fails to provide any argument or citation to authority explaining why the trial court erred in imposing these firearm enhancements.  Thus, we decline to address this issue.  *See Christian v. Tohmeh*, 191 Wn. App. 709, 727-28, 366 P.3d 16 (2015) ("[T]his court does not review issues not argued, briefed, or supported with citation to authority.") (citing RAP 10.3(a)(6)).

[4] RCW 10.73.090(1) provides, "No petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction."  There are six enumerated exceptions to this one-year time limit:  "(1) Newly discovered evidence, if the defendant acted with reasonable diligence in discovering the evidence and filing the petition or motion; (2) The statute that the defendant was convicted of violating was unconstitutional on its face or as applied to the defendant's conduct; (3) The conviction was barred by double jeopardy under Amendment V of the United States Constitution or Article I, section 9 of the state Constitution; (4) The defendant pled not guilty and the evidence introduced at trial was insufficient to support the conviction; (5) The sentence imposed was in excess of the court's jurisdiction; or (6) There has been a significant change in the law . . . or local government, and either the legislature has expressly provided that the change in the law is to be applied retroactively,

The State argues that Kozol's PRP must be dismissed as untimely because he failed to file it within the one-year time limit prescribed by RCW 10.73.090. We agree. Kozol concedes that, for purposes of finality under RCW 10.73.090(3), "the 2001 judgment became final when the mandate on the direct appeal issued on February 24, 2004." Thus, under RCW 10.73.090, Kozol had until February 24, 2005 to file a PRP regarding his convictions, but he did not file the instant PRP until June 1, 2022. Because Kozol waited more than one year after the 2001 J&S became final to file the instant PRP, it is untimely under RCW 10.73.090. Kozol attempts to avoid this one-year time limit, but for the reasons that follow each such attempt fails.

## A

Kozol first attempts to avoid the one-year time limit prescribed by RCW 10.73.090 by claiming that "the new judgment entered in November 2020 that became final on June 8, 2021, started the one year deadline of RCW 10.73.090." We disagree.

Our Supreme Court squarely rejected an argument similar to Kozol's in *In re Personal Restraint of Adams*, 178 Wn.2d 417, 309 P.3d 451 (2013). Like Kozol here, Adams filed a successful CrR 7.8 motion in 2009 to vacate his 2001 judgment and sentence as invalid on its face because his offender score was incorrectly calculated using prior washed out convictions. *Id.* at 420-21. After being resentenced based on the recalculated offender score, Adams filed a PRP in the

_____

or a court, in interpreting a change in the law that lacks express legislative intent regarding retroactive application, determines that sufficient reasons exist to require retroactive application of the changed legal standard." RCW 10.73.100. Kozol expressly disavows reliance on these exceptions.

Court of Appeals challenging his convictions based on ineffective assistance of counsel. *Id.* at 421. To avoid the one-year time limit prescribed by RCW 10.73.090, Adams argued that "because his original judgment and sentence was not 'valid on its face,' the collateral attack time bar is measured from the date of his 2009 judgment and sentence and therefore is timely." *Id.* at 422.

The Washington Supreme Court rejected Adams' argument. The court began its analysis with its prior decision in *Coats*, where a petitioner was resentenced after the court concluded that his judgment and sentence was facially invalid. *Id.* at 423 (citing *Coats*, 173 Wn.2d at 141). The *Adams* court observed that all three opinions in *Coats* "agreed that '[t]he exception for facially invalid judgments and sentences may not be used to circumvent the one-year time bar to personal restraint petitions relating to fair trial claims.'" *Id.* at 423 (citing *Coats*, 173 Wn.2d at 141 (Chambers, J. majority), 145 (Madsen, C.J., concurring), 164 (Stephens, J., concurring)). The *Adams* court similarly held that a petitioner's remedy in such a case is limited to correcting the sentencing error that rendered the judgment invalid. The court explained:

> Because the "valid on its face" precondition is an exception, once the one-year time limit has run, a petitioner may seek relief only for the defect that renders the judgment not valid on its face (or one of the exceptions listed in RCW 10.73.100). And when that defect is cured, the entry of a corrected judgment does not trigger a new one-year window for judgment provisions that were always valid on their face.

*Id.* at 424. The court added that a contrary holding would allow a petitioner to "simply wait to raise a fair trial claim until *after* the trial court corrects an error that renders the judgment and sentence invalid," which would improperly create a

"super exception" to the one-year time limit prescribed by RCW 10.73.090. *Id*. at 425,

As in *Adams*, Kozol's timeliness argument fails because none of his challenges to his convictions relate to the invalidity of the 2001 J&S. While Kozol correctly argued in his 2018 CrR 7.8 motion that the 2001 J&S was facially invalid due to an incorrect calculation of his offender score, *see In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 867-68, 50 P.3d 618 (2002), his remedy for this facial invalidity is limited to correcting the sentencing error, which the trial court did when it resentenced him using a correct offender score, *see Adams*, 178 Wn.2d at 427. Also similar to *Adams*, the facial invalidity of the 2001 J&S does not permit Kozol to challenge the underlying conviction on other grounds, including those asserted in Kozol's PRP.

Kozol argues that we should not follow *Adams* because it was purportedly overruled by *In re Personal Restraint of Fowler*, 197 Wn.2d 46, 51, 479 P.3d 1164 (2021). In *Fowler*, the petitioner's convictions were affirmed on direct appeal by the Court of Appeals, but the Supreme Court remanded to correct a sentencing error regarding legal financial obligations. *Id.* at 50; *State v. Fowler*, 185 Wn.2d 1016, 1016, 368 P.3d 170 (2016). After Fowler discovered the attorney he initially hired to file a PRP had not performed any work, Fowler hired a new attorney who filed a "placeholder" petition within one year of when his amended judgment and sentence became final and then filed a supplemental petition after the one-year time limit had expired. *Fowler*, 197 Wn.2d at 51-52. The Supreme Court held that Fowler's PRP was timely under the doctrine of equitable tolling due to his diligent

pursuit of his rights and extraordinary circumstances involving his initial attorney's "egregious attorney misconduct." *Id.* at 56-58. In a footnote, the Supreme Court stated:

> We note that the State argues the one-year clock began to run on May 2, 2016, when the Court of Appeals opinion mandated, and not October 19, 2016, when the superior court entered its amended judgment and sentence. . . . The Court of Appeals correctly held that the time bar ran in October, not May. We decline to revisit this holding.

*Id.* at 51 n.2. According to Kozol, this footnote effectively overruled *Adams*—even though it does not discuss or even mention *Adams*—because it acknowledges that the filing deadline in RCW 10.73.090 "must run from the date of entry of a new judgment, after the first one was vacated."

Contrary to Kozol's argument, the footnote in *Fowler* cannot properly be read to overrule the Supreme Court's previous opinion in *Adams*. That is so for at least three reasons. First, the *Fowler* footnote addressed when the "one-year clock beg[ins] to run" to file a PRP under RCW 10.73.090(3) following an amended judgment and sentence entered upon remand on direct appeal. *Fowler*, 197 Wn.2d at 51 n.2. In contrast, Kozol's instant PRP collaterally attacks a new judgment and sentence issued in connection with a CrR 7.8 motion for relief from judgment. This distinction is important because, unlike Fowler, Kozol already had an opportunity to collaterally attack his convictions and firearm enhancements when he filed his first PRP after the conclusion of his direct appeal.

Second, whether the trial court exercises discretion upon resentencing is irrelevant to the issue of timeliness here. In *Adams*, like in Kozol's case, the court reviewed the trial court's ruling granting the petitioner's "motion to vacate his

judgment and sentence" after it exercised discretion in "resentenc[ing] Adams . . . based on the recalculated offender score." 178 Wn.2d at 421. Thus, *Adams* implicitly recognized that the deadline to attack the validity of the underlying convictions under RCW 10.73.090 does not restart even if the trial court exercises discretion in correcting a sentencing error.

Third, our Supreme Court has held that a later holding overrules a prior holding sub silentio only "when it directly contradicts the earlier rule of law." *State v. Lupastean*, 200 Wn.2d 26, 40, 513 P.3d 781 (2022) (quoting *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 280, 208 P.3d 1092 (2009)). Here, the footnote in *Fowler* does not directly contradict the clear rule of law set forth in *Adams* that disposes of the exact timeliness argument presented by Kozol. For this reason too, we decline to conclude that *Fowler* overruled *Adams*.[5]

Kozol also urges us to disregard *Adams* because it did not analyze federal cases standing for the proposition that a newly issued judgment restarts the statutory period to file a federal habeas petition under 28 U.S.C. § 2244(d)(1).[6] But as Kozol recognizes, federal cases interpreting 28 U.S.C. § 2244 are not binding on Washington courts applying RCW 10.73.090. Additionally, the federal statute does not include facial invalidity language as our state statute does. *Compare* 28 U.S.C. § 2244(d)(1) *with* RCW 10.73.090. For these reasons, we

---

[5] Kozol's reliance on *State v. Waller*, is similarly misplaced because the sole issue in *Waller* was "whether RAP 2.2(b)(3) gives the State the right to appeal an order granting a CrR 7.8(b) motion." 197 Wn.2d 218, 224, 481 P.3d 515 (2021). *Waller* did not discuss *Adams* or address the issue of timeliness under RCW 10.73.090.

[6] *See Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 177 L. Ed. 2d 592 (2010); *Burton v. Stewart*, 549 U.S. 147, 127 S. Ct. 793, 166 L. Ed. 2d 628 (2007); *Berman v. United States*, 302 U.S. 211, 212, 58 S. Ct. 164, 82 L. Ed. 204 (1937); *Colbert v. Haynes*, 954 F.3d 1232 (9th Cir. 2020); *Smith v. Williams*, 871 F.3d 684 (9th Cir. 2017).

decline to follow federal precedent and adhere to our Supreme Court's holding in *Adams*. As *Adams* squarely holds, the 2020 J&S did not restart the one-year time limit under RCW 10.73.090 for Kozol to challenge his underlying convictions.

**B**

Next, Kozol argues that "the 'actual innocence' exception to RCW 10.73.090 allows for consideration of this petition." Again, we disagree.

The actual innocence doctrine allows a petitioner to avoid the one-year time limit prescribed by RCW 10.73.090 only if a petitioner satisfies the "probability standard." *In re Pers. Restraint of Weber*, 175 Wn.2d 247, 255-56, 284 P.3d 734 (2012). Our Supreme Court explained that standard as follows:

> Under the probability standard, the petitioner is required to show that in light of new evidence "it is more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt." This considers "what reasonable, properly instructed jurors would do." To be credible, a gateway actual innocence claim requires the petitioner to support his allegations with new, reliable evidence. This may include exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial.

*Id.* at 258-59 (quoting *Schlup v. Delo*, 513 U.S. 298, 324-329, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)) (internal citations omitted). As discussed below, the evidence upon which Kozol relies to show that he is actually innocent of the crimes of attempted murder and burglary does not satisfy this high evidentiary burden.

First, Kozol relies on a 2020 declaration from his former neighbor, Amal Osman, stating she saw and talked to Kozol while he was walking his dog at 10 p.m. on November 15, 2000—the same time the assailant was attacking Wolter. Osman's declaration does not satisfy the probability standard because it is directly

contradicted by Kozol's and his girlfriend's trial testimony that they were watching television inside their apartment at 10 p.m. on the night of the attack. Moreover, Kozol never mentioned during his trial testimony that he interacted with Osman on the night of the attack, even though this fact would have provided him with a crucial alibi defense. The timing of Osman's declaration also undermines its reliability because she signed it almost two decades after purportedly witnessing the events in question. *See State v. Riofta*, 166 Wn.2d 358, 372-73, 209 P.3d 467 (2009) (courts should consider "how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence") (quoting *Schlup*, 513 U.S. at 332).

Second, Kozol relies on an anonymous letter signed by "A repenting addict" addressed to the Seattle Post Intelligencer in 2009 in which the author confesses to having committed the crimes for which Kozol was convicted. The author claims that to pay off a debt to a drug dealer, they obtained keys to Kozol's storage unit and Wolter's house from a construction worker, stole Kozol's taser and firearm from his storage unit, and then attacked Wolter with those weapons while burglarizing his house. The author did not reveal their identity because "I'd spend the rest of my life in prison." This letter does not satisfy the probability standard due, in part, to the author's anonymity. *See Riofta*, 166 Wn.2d at 372-73 (we review posttrial affidavits casting blame on third parties with "a fair degree of skepticism") (citing *Herrera v. Collins*, 506 U.S. 390, 423, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) (O'Connor, J., concurring)). Furthermore, it is highly improbable that a stranger would have been given keys to Wolter's house and Kozol's storage

unit, stolen the exact weapons used in the attack in the four-day window between when Kozol put the taser in the storage and when the attack occurred, fitted the firearm with a silencer (which Kozol denied owning), and then used Kozol's weapons while burglarizing a house that happened to belong to Kozol's ex-roommate Wolter.

Third, Kozol claims that the State withheld evidence of Det. Gulla's past professional misconduct in violation of its disclosure requirements under the *Brady* rule, which requires prosecutors to disclose any impeachment evidence known to the prosecution that is "material to guilt or punishment." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 565, 397 P.3d 90 (2017) (citing *Strickler v. Greene*, 527 U.S. 263, 280-81, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). Kozol provides no authority for the proposition that a petitioner may prove an actual innocence claim using evidence of a *Brady* violation. *See In re Pers. Restraint of Campbell*, 27 Wn. App. 2d 251, 264, 533 P.3d 144 (2023) ("If a party provides no citation in support of a proposition, we may assume that counsel, after diligently searching, has found none."). Regardless, none of Det. Gulla's misdeeds had any connection to Kozol's case and would not have changed the outcome of trial given the overwhelming evidence of Kozol's guilt as detailed above. *See Lui*, 188 Wn.2d at 565 (undisclosed evidence is not material if there is only a "mere *possibility*" that it "*might* have helped the defense or *might* have affected the outcome of the trial") (quoting *State v. Kwan Fai Mak*, 105 Wn.2d 692, 704-05, 718 P.2d 407 (1986)).

Fourth, Kozol contends that the state destroyed evidence that he claims, upon further forensic testing, would have proven he did not commit these crimes.

- 14 -

This evidence includes the anonymous confessor's letter and envelope, a Rolex watch the anonymous confessor claims to have left at the crime scene, a hair found in Wolter's office, light bulbs from Wolter's office, shells from the shotgun that Wolter kept behind his bed, and Kozol's Audi. Here too, Kozol cites no authority for the proposition that improper destruction of evidence can be used to establish actual innocence. Additionally, the destroyed evidence had little importance or relevance. The letter, envelope, and light bulbs had already been forensically tested. It is unclear how forensically testing the hair and shotgun shells would have established Kozol's innocence because Wolter's assailant was wearing a ski mask and gloves, which would have prevented him from transmitting hair or fingerprints to the crime scene. An eyewitness saw Kozol driving the Audi on the day of the attack, which directly contradicts his claim that further testing of the vehicle would have proven it was not drivable that day. And it is highly unlikely that a person who was "committing robberies to support [their] drug habit" would wear a valuable watch while burglarizing a house and then point to the watch as "the only thing I can offer to prove I was the one who committed this crime."

In sum, because Kozol's proffered new evidence does not show that it is more likely than not that no reasonable juror would have found him guilty, the actual innocence doctrine does not allow him to avoid the one-year time limit prescribed by RCW 10.73.090.

**C**

Lastly, Kozol argues that this court has "inherent authority" to "waive" or "disregard" the one-year time limit under RCW 10.73.090 and should exercise that authority here. This argument also fails.

Kozol's inherent authority argument is largely premised on *Fowler*, which does not apply here. As noted above, the *Fowler* court analyzed this "inherent authority" in the context of a petitioner's request for equitable tolling, which permits a court to disregard the filing deadline under RCW 10.73.090 where the petitioner shows "(1) that they diligently pursued their rights and (2) that an extraordinary circumstance prevented a timely filing." *Fowler*, 197 Wn.2d at 54. The court defined "extraordinary circumstances" to include bad faith, deception, false assurances by another, and egregious misconduct by the petitioner's attorney. *Id.* Lastly, the court emphasized that equitable tolling is a remedy "used sparingly . . . when justice requires it." *Id.* at 53.

Even if Kozol had properly raised the type of equitable tolling argument contemplated by *Fowler* (which is unclear at best), we would not grant such relief because he has neither diligently pursued his rights nor demonstrated exceptional circumstances. Kozol has been aware of the grounds for all of his fair trial claims for many years, but he waited to raise them until after he was resentenced in 2020.[7] Unlike the petitioner in *Fowler*, Kozol fails to show how his delay in filing

---

[7] Kozol became aware of his claims regarding prosecutorial misconduct and erroneous admission of the silencer book at his trial in 2001. Kozol learned of Det. Gulla's past professional misconduct in 2005. By 2011, Kozol had learned of the State's destruction of the repenting addict's letter and the envelope, watch, hair, light bulbs, and shotgun shells. Regarding the Audi, Kozol has taken the position since trial it was not drivable on the day of the attack, but he waited until 2018 to attempt to test its drivability. Lastly, Kozol learned of the most recent basis for his ineffective assistance of counsel claim (his trial counsel's failure to hire a private investigator) in 2011.

his claims was the result of bad faith, deception, false assurances, or egregious attorney misconduct. Therefore, we decline to equitably toll the filing deadline prescribed by RCW 10.73.090.

Kozol also argues that if we are unwilling or unable to waive, toll, or disregard the one-year time limit prescribed by RCW 10.73.090, "the remedy is not to dismiss the case but to transfer it to the Supreme Court or the superior court" so that one of those courts may grant such relief. In support of transfer, Kozol cites to RCW 2.06.030, which states, "No case, appeal or petition for a writ filed in . . . [the Court of Appeals] shall be dismissed for the reason that it was not filed in the proper court, but it shall be transferred to the proper court." Kozol's argument fails because the cases upon which he relies have analyzed this statute in determining whether a PRP should be transferred to the Supreme Court as a successive petition, which the Court of Appeals is prohibited from considering under RCW 10.73.140. *See In re Pers. Restraint of Bell*, 187 Wn.2d 558, 560-61, 387 P.3d 719 (2017); *In re Pers. Restraint of Perkins*, 143 Wn.2d 261, 264, 19 P.3d 1027 (2001). Because Kozol's PRP is time barred, we dismiss it as RCW 10.73.090 requires.

### III

Finally, Kozol argues that dismissing his PRP as untimely would violate his constitutional right to access to the courts because it "allows the State to detain someone for decades in its prisons without allowing for collateral attacks on a new judgment." We disagree.

The right of access to the courts is protected by article 1, section 10, of our state constitution, which mandates that "[j]ustice in all cases shall be administered openly, and without unnecessary delay."[8] In describing this right, our Supreme Court has explained, "That justice which is to be administered openly is not an abstract theory of constitutional law, but rather is the bedrock foundation upon which rest all the people's rights and obligations. In the course of administering justice the courts protect those rights and enforce those obligations." *Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 780, 819 P.2d 370 (1991). But at the same time, the constitutional right of access to the courts exists "within the broader framework of the law as expressed in statutes" and is "not absolute." *Id.* at 782; *Whitney v. Buckner*, 107 Wn.2d 861, 866, 734 P.2d 485 (1987). Put another way, litigants are not entitled to unlimited access but rather "*meaningful* access to the courts." *Id*. at 866.

Consistent with this constitutional right and corresponding constraints, our Supreme Court has held that the "statute of limitations on petitions for collateral review [prescribed by RCW 10.73.090] is constitutional." *See In re Pers. Restraint of Runyon*, 121 Wn.2d 432, 445, 853 P.2d 424 (1993). In *Runyon*, the court rejected the petitioners' argument that this one-year time limit violates the suspension clause of the Washington Constitution[9] because it is not a "strict time

---

[8] While Kozol also relies on various amendments to the United States Constitution, he does not argue, nor does he establish, that the federal constitution provides greater protection than our state constitution. We therefore rely on and apply Washington precedent regarding article 1, section 10, of our state constitution.

[9] "The privilege of the writ of habeas corpus shall not be suspended, unless in case of rebellion or invasion the public safety requires it." WASH. CONST. art. I, § 13.

limit on habeas petitions" given the many "substantial" exceptions to this time limit codified in RCW 10.73.090 and .100. *Id.* at 444-45. The court also rejected the petitioners' equal protection claims[10] because it found the one-year time limit to be a reasonable means for achieving the legitimate state objective of controlling the flow of PRPs. *Id.* at 449.

More broadly, the *Runyon* court concluded that RCW 10.73.090 withstands constitutional scrutiny because it appropriately balances prisoners' rights to seek habeas relief with the State's interest in controlling prisoner litigation. The court noted that "[i]n streamlining the postconviction collateral review process, RCW 10.73.090 *et seq.* have preserved unlimited access to review in cases where there truly exists a question as to the validity of the prisoner's continuing detention." *Id.* at 453. And it added that "postconviction collateral review was never intended to be a 'superconstitutional procedure enabling [the petitioner] to institute appeal upon appeal and review upon review in forum after forum ad infinitum.'" *Id.* at 453-54 (quoting *Holt v. Morris*, 84 Wn.2d 841, 852, 529 P.2d 1081 (1974) (Hale, C.J., concurring)). Emphasizing this latter point, the court concluded, "This general 1–year time limit is a reasonable and constitutional method for ensuring that collateral review does not degenerate into such a procedural merry-go-round." *Id.* at 454.

Here too, Kozol's right to access the courts to file a second PRP is "not absolute" and must be exercised "within the broader framework of the law as expressed in statutes," including RCW 10.73.090-.100. *Doe*, 117 Wn.2d at 782;

---

[10] The federal and state equal protection clauses require that "'persons similarly situated with respect to the legitimate purpose of the law receive like treatment.'" *Id.* at 448 (citing U.S. CONST. amend. XIV and WASH. CONST. art. I, § 12 and quoting *Harmon v. McNutt*, 91 Wn.2d 126, 130, 587 P.2d 537 (1978)).

*Whitney*, 107 Wn.2d at 866. Consistent with this statutory framework, Kozol has been afforded ample access to the courts to challenge his convictions. After being convicted by a jury, he has challenged his convictions on direct appeal and collateral attack in state court. He was able to obtain meaningful relief, despite the one-year time limit prescribed by RCW 10.73.090(1), by showing that his offender score had been calculated incorrectly—as the exception for facially invalid judgments and sentences allows. But Kozol does not have a constitutional right to pursue a second PRP challenging his decades old convictions on grounds entirely unrelated to the offender score. Kozol's argument that he has been denied meaningful access to the courts, like his other attempts to avoid one-year time limit for filing a PRP, thus fails.

We dismiss Kozol's PRP as time barred.

Feldman, J.

WE CONCUR:

Birk, J.

Dwyer, J.