IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

|  |  |  |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 39100-1-III |
|  | ) |  |
| LACEY K. HIRST-PAVEK, | ) |  |
|  | ) | UNPUBLISHED OPINION |
| Petitioner. | ) |  |

STAAB, J. — In 2010, a jury found Lacey Hirst-Pavek guilty of aggravated first degree murder and first degree manslaughter based on the stabbing deaths of Michelle Kitterman and her unborn quick child. Several years after her convictions became final, Hirst-Pavek filed a CrR 7.8 motion in superior court arguing that her convictions were tainted by violations of her constitutional rights including the introduction of false and perjured testimony, the violation of her right to testify, and ineffective assistance of counsel. To overcome the procedural time bar, she argues that new evidence demonstrates "gateway actual innocence."

The superior court found that the new evidence established gateway actual innocence with respect to Hirst-Pavek's manslaughter conviction, concluding that new evidence demonstrated that the State's pathologist provided false testimony about the gender of the fetus, and the false testimony called into question the pathologist's related opinion that the fetus was sufficiently developed to be a quick child. The court went on

to find constitutional violations and vacated the manslaughter conviction. This decision was not appealed and is not before the court now.

With respect to Hirst-Pavek's murder conviction, the court concluded that Hirst-Pavek failed to demonstrate a substantial showing that she is entitled to relief under CrR 7.8 and transferred the motion on the murder conviction to this court for consideration as a personal restraint petition (PRP).

We conclude that the new evidence produced by Hirst-Pavek fails to satisfy the probability standard of gateway actual innocence. Consequently, the constitutional claims raised in her motion are time barred. We therefore deny this PRP.

BACKGROUND

Hirst-Pavek acknowledges that her petition was filed more than one year after her convictions became final and that it is also successive. As a preliminary matter, Hirst-Pavek must meet her burden of establishing that her petition is not time barred. She seeks to avoid the procedural time bar by raising gateway actual innocence, recognized in *In re Pers. Restraint of Weber*, 175 Wn.2d 247, 284 P.3d 734 (2012). This exemption tolls the procedural time bar when the court is convinced, in light of new reliable evidence, that "'it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" *Id*. at 260 (quoting *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)). When a petitioner meets this

2

standard, her otherwise untimely constitutional claims pass through the gateway and may be considered by the court. *Id.* at 259.

The specifics for establishing gateway actual innocence are set forth in more detail below. However, to properly understand the evidence presented at trial and the new evidence presented in support of this (PRP), we note here that gateway actual innocence requires this court to consider "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 328, 327).

With this background in mind, we turn to the evidence.

A. Procedural History

Michelle Kitterman's body was found on March 1, 2009, in Okanogan County, west of Tonasket. Kitterman was pregnant at the time of her death.

Four individuals were ultimately convicted of being involved in Kitterman's murder: the petitioner, Lacey Hirst-Pavek, Tansy Mathis, David Richards, and Brent Phillips. *State v. Richards*, No. 29075-1-III, slip op. at 2 (Wash. Ct. App. Jan. 30, 2014) (unpublished), https://www.courts.wa.gov/opinions/pdf/290751.unp.pdf.

At trial, the State's theory of motive was that Hirst-Pavek's husband, Danny

Pavek,[1] was having an affair with Kitterman, who became pregnant with Danny's child.

This enraged Hirst-Pavek, who told several people that she wished harm upon Kitterman

and her unborn child. Eventually, Hirst-Pavek solicited and facilitated another person,

Tansy Mathis, to "take care of the baby situation," encouraging her to act by claiming

that Kitterman was going to snitch on Mathis. Hirst-Pavek facilitated the murder by

promising money, renting a car, and acting as a look out. Mathis solicited the help of

David Richards, who convinced his roommate, Brent Phillips, to assist. Mathis and

Phillips killed Kitterman by stabbing her on the side of a road. Although Hirst-Pavek

was not present when Kitterman was killed, the State alleged that she solicited and

facilitated Kitterman's murder and was culpable as an accomplice.

Phillips pleaded guilty to several charges and agreed to testify at the trials of the

other co-defendants. Mathis and Richards were tried together and both were found

guilty. Hirst-Pavek was tried separately six months later. In November 2010, a jury

found Hirst-Pavek guilty of aggravated first degree murder as an accomplice to the

murder of Michelle Kitterman (count 1A) and first degree manslaughter for the death of

---

[1] To avoid confusion, we refer to Danny Pavek by his first name. No disrespect is intended.

Kitterman's unborn quick child[2] (count 2). On direct appeal, these convictions were affirmed. *See State v. Hirst-Pavek*, noted at 168 Wn. App. 1043 (2012) (case no. 29555-9-III). Hirst-Pavek's first timely PRP was dismissed. *See* Order Dismissing Pers. Restraint Pet., *In re Pers. Restraint of Hirst-Pavek*, No. 32135-5-III, at 1-2 (Wa. Ct. App. Sept. 5, 2014).

In support of her current motion, Hirst-Pavek produced new evidence that generally falls into three categories: (1) evidence showing that prior to Kitterman's murder, Hirst-Pavek had abandoned any intent to harm Kitterman or her unborn child, (2) evidence suggesting that codefendant Phillips lied during his testimony and was solely responsible for Kitterman's death, and (3) evidence that the forensic pathologist falsely testified that male genitalia was visible on the fetus, and this genitalia supported her conclusion that the fetus was developed to the point where it could move.

While there was a significant amount of evidence produced at trial, we focus our review on these three areas of evidence.

---

[2] Quickening or a "quick child" is a fetus that is gestationally developed enough that the fetus' movement is felt by the mother. BLACK'S LAW DICTIONARY 1504 (11th ed.) (2019) ("The first motion felt in the womb by the mother of the fetus, [usually] occurring near the middle of the pregnancy.").

B. Evidence Produced at Trial

> *(i) Evidence of Hirst-Pavek's Intentions to Harm Kitterman and Hirst-Pavek's*
> *Involvement in the Murder.*

At the time of Kitterman's death, Hirst-Pavek was married to Danny Pavek. In December 2008, Hirst-Pavek discovered that Danny was having an affair with Kitterman and that Kitterman was pregnant.

The State produced evidence that Hirst-Pavek became obsessed with Kitterman and the pregnancy. She spoke about the situation frequently with friends and coworkers, her work performance deteriorated, and she frequently expressed her desire that Kitterman and the child would die or leave the area.

According to one witness, Hirst-Pavek was, at times, hysterical about the pregnancy. Hirst-Pavek became preoccupied with keeping track of Kitterman's location and activities. She constantly contacted others regarding the whereabouts of her husband and whether he was with Kitterman.

In an effort to have Kitterman arrested, Hirst-Pavek contacted law enforcement several times. On February 2, 2009, based on a tip from Hirst-Pavek, police stopped Kitterman and arrested her for driving on a suspended license and possession of methamphetamine. Kitterman was later released. Hirst-Pavek told others that Kitterman was released because she had made a deal with police, but this was refuted by testimony at trial.

6

Hirst-Pavek became convinced of Danny's paternity on February 19, 2009, after an ultrasound confirmed Kitterman's pregnancy. Following the ultrasound, Hirst-Pavek confronted Danny and Kitterman, and attempted to hit Kitterman.

Hirst-Pavek's obsession with Kitterman continued to grow. Hirst-Pavek wanted Kitterman to terminate the pregnancy. Eventually, Hirst-Pavek's employer required her to take a leave of absence from work because her personal problems were interfering with her job performance. Testimony from a coworker revealed Hirst-Pavek's comments about Kitterman had become "threatening" and "abusive." Rep. of Proc. (RP) (Hirst-Pavek) at 333. Several state witnesses testified that Hirst-Pavek wanted Kitterman to be harmed.

Andrea Orlando, a friend and relative of Kitterman, testified that approximately three weeks before Kitterman's murder Hirst-Pavek called her wanting to find someone to "beat up" Kitterman. According to Orlando, Hirst-Pavek wanted to "take care of [Kitterman], get rid of her." RP (Hirst-Pavek) at 661. Orlando thought Hirst-Pavek meant that maybe she wanted someone to beat up Kitterman, or maybe Hirst-Pavek wanted Kitterman to go back to Seattle. Hirst-Pavek told Orlando she would be willing to pay money or drugs to have Kitterman "blanketed," meaning that she wanted a blanket thrown over Kitterman and for "a bunch of people [to] beat her up so she would [lose] her baby." RP (Hirst-Pavek) at 662.

7

One of Hirst-Pavek's coworkers testified that Hirst-Pavek had made comments to him on "numerous occasions" about having Kitterman "taken care of, having some friends in Spokane that were gonna come fix this problem for her, making [Kitterman] disappear." RP (Hirst-Pavek) at 333.

An acquaintance, Jasmine Walts, testified that Hirst-Pavek commented several times that "if it was anybody else maybe they could, you know, try to figure something out, work something out, but as far as it being [Kitterman] she just, she did not want to deal with [Kitterman]." RP (Hirst-Pavek) at 608

Marcella Raymer testified that about two weeks before the murder, Hirst-Pavek said she hated Kitterman and that she was going to hire four people take care of Kitterman and the baby. Hirst-Pavek told Raymer that she (Hirst-Pavek) planned to drug Danny to keep him away from Kitterman when the four people took care of Kitterman. According to Raymer, Hirst-Pavek "was screaming and saying I hate her, I hate her, I hate her" after she learned Danny was the father of the baby. While Raymer testified that she believed Hirst-Pavek wanted Kitterman to be killed, she also testified that she did not believe Hirst-Pavek at first. On cross-examination, Raymer acknowledged that Hirst-Pavek did not use the word "kill." Instead, she testified, "she was gonna hire four people to take care of [Kitterman] and the baby." RP (Hirst-Pavek) at 581.

Despite testimony that Hirst-Pavek wanted harm to come to Kitterman and her unborn child, there was also evidence that Hirst-Pavek made contrary statements.

Detective Mike Murry testified that Hirst-Pavek admitted that she traveled to Spokane in late January or early February and met with Mathis, a methamphetamine dealer acquainted with Danny and Kitterman. Hirst-Pavek told Detective Murry that she and Mathis talked about ways Hirst-Pavek could "get [Kitterman] to go away." RP (Hirst-Pavek) at 1478. Mathis told Hirst-Pavek it would take about $10,000 and is something Hirst-Pavek would have to live with for the rest of her life. Detective Murry testified that Hirst-Pavek said in response to Mathis's proposal: "I'm not willing to do that. I'm not doing that." RP (Hirst-Pavek) at 1479.

After her trip to Spokane, Hirst-Pavek told a coworker that she had gone to Spokane to hire someone "to take care of" Kitterman, but "couldn't go through with it." RP (Hirst-Pavek) at 494. According to the coworker, Hirst-Pavek seemed as though she felt embarrassed for even thinking about it and that Hirst-Pavek had come "to her senses." RP (Hirst-Pavek) at 502-03.

Corporal Todd Hill testified that on February 21, Hirst-Pavek called him and informed him that Kitterman was violating the conditions of her release. Hirst-Pavek told Corporal Hill that Kitterman was "pregnant with Daniel's child and that [she and Danny] were okay with that." RP (Hirst-Pavek) at 528. Hirst-Pavek also said to Corporal Hill that "Kitterman was using methamphetamine and she was concerned about the safety of the [unborn] child." RP (Hirst-Pavek) at 527-28.

9

On February 25, Mathis was "in town" and called Hirst-Pavek to meet up for dinner in Omak. The next day, on February 26, Hirst-Pavek rented an SUV from her employer and then turned the vehicle over to Mathis. Mathis returned to Spokane in the vehicle, picked up Brent Phillips, and drove back to Okanogan or Omak area.

On February 28, Kitterman was babysitting at the house where she was staying. Earlier that day, Hirst-Pavek had called Jasmine Walts and her boyfriend, Mike McClure, and asked them to surreptitiously confirm that Kitterman was at this house and let her know who else was there. Hirst-Pavek told these witnesses that some people were coming into town and "it would all be handled by Monday[,] she would be able to go back to work[;] and everything would be back to normal." RP (Hirst-Pavek) at 605. Walts testified that she thought Hirst-Pavek might be setting Kitterman up for a drug bust.

Between February 25, the day before the car was rented, and March 1, the day that Kitterman's body was discovered, Hirst-Pavek and Mathis exchanged 158 phone calls and text messages.[3] After March 1, Hirst-Pavek ceased communications with Mathis.

On March 5, 2009, Hirst-Pavek contacted the police, indicating she had information about Kitterman's death. When interviewed, she denied ever asking anyone to keep track of, confront, or take care of Kitterman. When the detective asked if he

---

[3] The contents of these communications are not part of the record.

10

could look at Hirst-Pavek's cell phone, she indicated that she had lost her phone a few days prior.

During this interview, Hirst-Pavek told detectives that in late February, Mathis had called her to say she was in town and the two went to dinner and then to Walmart where Hirst-Pavek helped Mathis buy a prepaid phone. Hirst-Pavek also told detectives that Mathis had asked her to rent a car for Mathis, so Mathis could go to Chelan, explaining that Mathis did not have a credit card and knew Hirst-Pavek worked for a car dealer.

Hirst-Pavek told detectives that during a later phone call, Mathis told her that she (Mathis) was going to stop and talk to Kitterman and tell her that she needs to keep her mouth shut and not talk to police. Hirst-Pavek explained that she texted and called Mathis numerous times because she was worried about getting the rental car back in time. When Mathis finally returned the car, she pulled Hirst-Pavek aside and said "remember what happens to people when they talk." RP (Hirst-Pavek) at 898. Hirst-Pavek told detectives that she did not know what Mathis meant by this statement.

Hirst-Pavek went on to acknowledge that she knew "people have said a lot of things in the last few days" about her involvement in Kitterman's murder. RP (Hirst-Pavek) at 899-901. She admitted that she did not like Kitterman and had said things to other people. Hirst-Pavek told Detectives that "[s]omebody has said that I would pay somebody to have [Kitterman] taken care of and I did not say that," and "I would not do that." RP (Hirst-Pavek) at 908.

11

Mathis and Phillips were both arrested. On March 31, detectives again interviewed Hirst-Pavek. During this interview, Hirst-Pavek again described her conversation with Mathis when the two had dinner on February 25. Hirst-Pavek told the detectives that she most likely told Mathis that she wished Kitterman would just go away or lose the baby. While denying that Mathis was doing drugs when they met for dinner, Hirst-Pavek admitted that Mathis gave her some drugs for Danny.

When the detectives told Hirst-Pavek that Mathis and Phillips had been arrested, and people were making deals, Hirst-Pavek asked the detectives if they could stop recording for a moment. According to Detective Murray, while the recording was off, Hirst-Pavek asked, "what would happen if she changed her story" and said "the truth was that she wanted [Kitterman] gone and the baby dead . . . that Mathis had asked her if this is what she wanted, and she said it was." RP (Hirst-Pavek) at 1483.

With the recorder back on, Hirst-Pavek told detectives that she told Mathis she did not want to harm Kitterman. However, she then stated she told Mathis that she wanted Mathis to "take care of the baby situation." RP (Hirst-Pavek) at 1518-20. She also admitted renting a car that Mathis could drive to Spokane in order to pick up people "to help her do whatever she was going to do," meaning take care of the baby. RP (Hirst-Pavek) at 1490-91. When Hirst-Pavek received a text in the early morning hours indicating that Mathis was with Kitterman, Hirst-Pavek told detectives that she

12

"assumed" that Mathis was going to go through with "her thing." RP (Hirst-Pavek) at 1489.

When Mathis returned the rental vehicle to Hirst-Pavek, Mathis told Hirst-Pavek that she would owe Mathis $500. Hirst-Pavek said she let Mathis "believe" she was going to pay. RP (Hirst-Pavek) at 1492. But Hirst-Pavek never paid Mathis any money because she "didn't want [to]" and she "never agreed to it." RP (Hirst-Pavek) at 1491. Hirst-Pavek also told the detectives that Mathis agreed to pay her back for renting the vehicle but never did.

### (ii) Testimony of Brent Phillips

Phillips testified at Hirst-Pavek's trial. At the time, he was in custody after entering a guilty plea to first degree murder, first degree manslaughter, kidnapping, and obstruction of physical evidence, in connection with the murder of Kitterman.

Prior to his arrest, Phillips lived in Spokane with Richards. Phillips was a self-proclaimed "tax man" and collected money from people who owed Richards money for drugs. Richards was a drug dealer, and Mathis was Richards's supplier.

Phillips testified that Richards had asked him to participate in "taxing" or beating up a "snitch" in Okanogan. Richard told Phillips that he would be paid $1,000 to beat up a "snitch" and $500 to beat up anyone that got in the way. He said the amount was $10,000 if someone was killed.

13

In preparation for taxing the snitch, Richards unsuccessfully tried to obtain a gun. On the night they were supposed to be leaving for the taxing, Richards acted like he was asleep and did not go with Mathis and Phillips.

Mathis picked up Phillips in a rented blue SUV prior to heading to Okanogan. When she arrived to pick up Phillips, Mathis had an "ice pick" with her that belonged to Richards. Phillips testified that the ice pick was actually a triangular file with a wood handle.

As they drove to Okanogan, Phillips ingested methamphetamine. Once they arrived in Okanogan, Mathis parked a few doors down from the house where Kitterman was babysitting. Mathis confirmed with Phillips that he would be paid for beating up a snitch. Mathis made a phone call and asked the person on the phone if "he" was still there, and then said "hold him there if you can." RP (Hirst-Pavek) at 732.

Mathis then called Kitterman and asked if Mathis and Phillips could come over. Mathis told Phillips that Kitterman was a "dope whore" and the three of them smoked methamphetamine together. Kitterman eventually agreed to go to a casino, and the three of them left in the rental car. On the way, Kitterman stated she wanted to "smoke another bowl," but Mathis would not allow her to do so in the car because it was a rental, so Mathis pulled off the road. At that time, Mathis informed Phillips that Kitterman was the snitch.

14

When Kitterman attempted to get back into the vehicle, Phillips grabbed her and threw her to the ground. When Kitterman tried to get back up, Phillips slammed her against the car. Phillips then told Kitterman, "you need to stop snitchin on people" and threw her to the ground and began choking her. RP (Hirst-Pavek) at 746. Mathis appeared next to Phillips and began stabbing Kitterman in the stomach with the ice pick. Once Kitterman was "out cold," Mathis told Phillips to "finish it." RP (Hirst-Pavek) at 748. Phillips then stabbed Kitterman in the hip, shoulder, back, and neck with the ice pick.[4]

Mathis and Phillips dragged Kitterman further off the side of the road and drove away. As they drove, Mathis was making calls. Phillips understood that Mathis would be returning the rental vehicle to her friend, the wife of Kitterman's boyfriend. Mathis gave Phillips $500, which he promptly gave back to her because he thought the money belonged to Richards. Mathis then gave Phillips five grams of methamphetamine.

Kitterman's body was discovered the next morning, on March 1, 2009.

After Phillips's arrest, he initially told police that he did not kill Kitterman. Instead, he said that Richards was present at the scene, and that Richards killed Kitterman. During Hirst-Pavek's trial, Phillips was cross-examined about inconsistent

---

[4] In a "Proffer of Brent Phillips Testimony," Phillips stated that he lied when he said the murder weapon was an ice pick. Instead, the murder weapon was a "triangle file." Petitioner's Appendix at 301.

15

statements he made to law enforcement after being arrested, and admitted initially lying about his own involvement and Richards's presence at the scene. Phillips could not remember if he said anything about being paid when he initially talked to police. The State and Hirst-Pavek's counsel both questioned Phillips about the testimony he had provided previously in the Mathis/Richards trial, but the questioning did not reveal any material inconsistencies in Phillips's testimony between the two trials.

Phillips acknowledged that he was testifying as part of a plea agreement that required him to testify truthfully, and if he did not comply with the agreement he could face life in prison without parole. If Phillips followed his agreement, the prosecutor agreed to recommend a sentence of 26 years in prison.

### (iii)    *Evidence that Mathis Covered Up the Crime*

The State produced evidence that after Kitterman was murdered, Mathis drove the rental car to the house of an acquaintance near Republic. At the house, Mathis and her boyfriend, along with Phillips, vacuumed and wiped down the car with a cleaner that smelled like bleach.

Several days after the murder, Mathis contacted another acquaintance, Brian Hohman, and asked for his help. Hohman testified that Mathis admitted that she and Phillips were being paid to beat up Kitterman. Mathis told Hohman that Phillips attacked and killed Kitterman. She said that Richards and Phillips were now expecting payment. Mathis asked Hohman to drive to Hirst-Pavek's house and "tell her to keep her mouth

16

shut and not say anything." RP (Hirst-Pavek) at 998, 1031. Mathis then indicated to Hohman that Phillips "had to be taken care of," but that it should look like an overdose. RP (Hirst-Pavek) at 1016. Hohman testified that he understood Mathis wanted him to kill Phillips.

### (iv)    Testimony of Forensic Pathologist

Dr. Gina Fino, a forensic pathologist testified for the State. She performed the autopsy on Kitterman. Dr. Fino testified that Kitterman's cause of death was multiple puncture wounds to the chest and back, and the blunt force trauma to Kitterman's head was a contributing factor. She identified five shallower stab wounds in a cluster on Kitterman's lower abdomen. She stated that Kitterman's injuries could have been consistent with an ice pick being used as a weapon.

In support of the manslaughter charge, Dr. Fino testified that Kitterman's fetus was capable of movement. She based her opinion on the physical development of the fetus including visible male genitalia, which generally does not begin to form until sometime between 9 and 11 weeks of gestational age. Although she could not say for certain if the fetus had moved, she testified that reflexive movements occur at the spinal cord level at that particular stage of development. The State also produced three lay witnesses who were close to Kitterman, and who testified that Kitterman had told them she could feel the baby move.

17

Dr. John Butt was hired by the defense and testified that it was unlikely, given the records and physical development of the fetus, that it could move. He stated that the fetus starts moving after 12 weeks. Based on Kitterman's clinical records, autopsy records, and photographs, Dr. Butt testified that the photographs and ultrasound indicated that the gestational age of the fetus to be 11.5 weeks and the fertilization age to be 9.5 weeks.

The jury found Hirst-Pavek guilty of aggravated first degree murder, first degree manslaughter, with special findings that Hirst-Pavek was armed with a deadly weapon during the commission of the crimes. The jury also found the State had proved the aggravating circumstances that Hirst-Pavek solicited, paid, or agreed to pay for Kitterman's murder, and that Hirst-Pavek knew Kitterman was pregnant.

The court sentenced Hirst-Pavek to life imprisonment without the possibility of parole on the aggravated murder conviction and to 102 months on the manslaughter conviction.

C. New Evidence

As stated above, Hirst-Pavek introduced new evidence as part of her motion to demonstrate gateway actual innocence.

>        *(i)      New Evidence of Hirst-Pavek's Intentions*

Hirst-Pavek provides several declarations in support of her claim that shortly before Kitterman's murder she had a change of attitude toward the child and was embracing the idea of raising the child with her husband, Danny.

>    <u>*Declaration of Lacey Hirst-Pavek*</u>: Hirst-Pavek did not testify at her trial, but provided a declaration in support of her petition. She declares she did not offer money or anything of value to anyone to kill Kitterman. She states she did not have any part, or any role in the death of Kitterman.

>    Regarding her feelings toward Kitterman and the baby, Hirst-Pavek declares:

>> While I may have made comments to co-workers and other people that were inappropriate after hearing the news of the affair and pregnancy, I never wanted any harm done to the baby, nor to . . . Kitterman. I also talked to other people about wanting . . . Kitterman to seek an abortion.

Petitioner's Appendix (Pet. App.) at 8. Hirst-Pavek states that by February 2009, her "anger about the situation simmered," she had accepted Kitterman's pregnancy, and even started making plans to get custody of the baby and raise the child if Kitterman could not do so. Pet. App. at 9.

Hirst-Pavek states that Mathis was worried that Kitterman had been "released from jail to help the police obtain information about Danny and [Mathis's] drug trafficking" as an informant. Pet. App. at 12. Hirst-Pavek goes on to explain that just a

few days before the murder, Mathis told her that Mathis would be contacting Kitterman, but only to make sure that Kitterman did not cooperate with police.

Hirst-Pavek states she agreed to rent Mathis a four-wheel drive car, even though she knew it was against company policy. She explained that Mathis told her that Mathis needed the car so that she could pick some people up in Spokane to "help her," but Hirst-Pavek was not sure what that meant.

Hirst-Pavek declares that Danny was home with her on Saturday evening, February 28. She states that on March 1, 2009, at 4:00 a.m. she heard from Mathis to arrange the drop-off of the SUV. When Hirst-Pavek met with Mathis, Mathis said, "Remember what happens to people that talk." Pet. App. at 15. Hirst-Pavek explains that she did not know why Mathis said that to her and–at that time–she did not know that Kitterman was dead. Hirst-Pavek also declares that Mathis told her she owed $500 to Mathis, but that Mathis did not explain what the money was for. Hirst-Pavek assumed it was in relation to the debt Danny owed for methamphetamine.

*Declaration of Kellie McClure*: Kellie McClure was friends with Kitterman, and knew Danny, and Hirst-Pavek.

McClure testified at Hirst-Pavek's trial about incriminating statements made by Hirst-Pavek. She testified that when Hirst-Pavek learned that Kitterman was pregnant, she became extremely upset, wailing and crying. During a later conversation, Hirst-Pavek asked McClure if McClure could force Kitterman to have an abortion. Later, when

20

Hirst-Pavek stopped by the bar where McClure worked, she overheard Hirst-Pavek say that she wanted Kitterman "to just disappear, go away," and that she "wished that she would die or something like that." RP (Hirst-Pavek) at 679.

In a supplemental declaration provided in support of Hirst-Pavek's motion, McClure states that her testimony at trial was true and correct, but needed clarification. She clarifies that during the first couple weeks of February 2019, she spoke to Hirst-Pavek several times about getting custody of Kitterman's child. Hirst-Pavek told McClure that she was open to the idea and the two of them brainstormed on how to go about obtaining custody. McClure states that after she began talking to Hirst-Pavek about getting custody of the baby, Hirst-Pavek "never again talked the way she did to me at [the bar]" or bring up the issue of abortion. Pet. Supp. App. at 161.

*Declaration of Danny Pavek*: Hirst-Pavek and Danny remain married today. Danny did not testify at trial. In his declaration he states that during his marriage to Hirst-Pavek, he engaged in a romantic relationship with Kitterman, and Kitterman became pregnant and he believed he was the father.

Danny states he was with Kitterman the day before she was killed. He declares that on the evening of February 28, Mathis called him and told him to go to the house he shared with Hirst-Pavek by himself—without Kitterman. Mathis then told Danny she would bring methamphetamine to him at his (and Hirst-Pavek's) home. Danny fell

21

asleep waiting for Mathis, but Mathis never arrived. Danny declares he woke up a few hours later and drove to meet with Kitterman, but could not find her.

According to Danny, Hirst-Pavek was one of the only people that expressed care for the unborn child and that she and Danny discussed raising the child if Kitterman could not do so.

Danny states Hirst-Pavek did not kill Kitterman, nor was she involved in any way in Kitterman's murder.

*Declaration of Greg Fisher*: Greg Fisher knew Hirst-Pavek and Danny for approximately 20 years. He also knew Kitterman. He declares that Hirst-Pavek had expressed to him that she wanted Kitterman to have an abortion. Fisher states Hirst-Pavek told him that if Kitterman was unfit to raise the child due to her drug use, Hirst-Pavek would attempt to gain custody of the child. Fisher also states that Hirst-Pavek told him that obtaining custody of the child would make her and Danny happy because the pair could not have a child together. Finally, Fisher declares that while Hirst-Pavek had told him that she wished Kitterman was out of the picture, Fisher does not believe Hirst-Pavek meant she wanted Kitterman killed or that she wanted any harm done to Kitterman and the unborn child.

*Declaration of Megan Williams*: Megan Williams is a friend of Danny and has known him for 20 years. Danny and Hirst-Pavek visited Williams in Auburn, Washington in February 2009, before Kitterman's murder.

22

Williams declares that during this time, Hirst-Pavek confided to her that Hirst-Pavek was worried about the welfare of the unborn child because Kitterman was using drugs. Hirst-Pavek told Williams that she and Danny planned to care for the child once it was born. Hirst-Pavek also told Williams that raising the baby with Danny would give them an opportunity to raise a child together since Hirst-Pavek could no longer give birth. Williams states Hirst-Pavek never expressed hate nor anger during the conversation and that she had accepted the fact that Kitterman was pregnant, even though the situation had an emotional impact on her.

*Declaration of Deborah Goodrich*: Deborah Goodrich has known Danny for many years and met Hirst-Pavek when Goodrich was an obstetrics nurse. Goodrich declares that she spoke with Hirst-Pavek prior to Kitterman's death and Hirst-Pavek expressed her concern that Kitterman's drug abuse would harm the unborn child. Because she was a nurse, Hirst-Pavek had asked Goodrich what types of medical effects methamphetamine use could have on the unborn child. Goodrich provided articles to Hirst-Pavek about the effects of drug use on unborn babies.

Goodrich states Hirst-Pavek was concerned about the health of the baby and wanted to make sure the baby would be safe after it was born. Hirst-Pavek told Goodrich that she would care for the baby if Kitterman could not, and that she was willing to get Kitterman into substance abuse treatment if Kitterman was willing to go.

23

*(ii)     Evidence to Attack the Credibility of Codefendant Phillips*

Hirst-Pavek provides new evidence to discredit the testimony of Phillips who admitted killing Kitterman, but testified that Mathis told him he would be paid for taxing a snitch and that Mathis participated in the crime and directed him to kill Kitterman. The new evidence includes inconsistent statements Phillips made to law enforcement before he pleaded guilty. It also includes hearsay statements from two persons who know Phillips and claimed that Phillips bragged about killing Kitterman and lying about the involvement of others to get a better plea deal. Hirst-Pavek contends that these statements corroborate Mathis's testimony during her own trial that she was not involved in the murder and Phillips acted alone in killing Kitterman. Hirst-Pavek argues that if Phillips did not kill Kitterman at the direction of Mathis, then there is no evidence that Hirst-Pavek facilitated the murder.

*Brent Phillips's Statements*: Hirst-Pavek produced several pretrial statements by Phillips in support of her claim of gateway actual innocence. These statements were available to defense counsel before Hirst-Pavek's trial.

On March 26, 2009, Phillips spoke with police and "denied knowing anything about a murder, denied ever going anywhere with Mathis, and he did not know where Tonasket or Republic [was located]." Pet. Supp. App. at 215. On March 30, Phillips provided two statements to police. This time, he confessed to assaulting Kitterman, but claimed that Mathis and Richards killed her. He surmised that Richards used an ice pick

24

that Richards was known to carry, but did not see Richards stab Kitterman. In the second interview, Phillips maintained that Richards and Mathis had killed Kitterman.

One year later, on March 1, 2010, in the process of negotiating a plea agreement, Phillips signed a written "proffer" about his involvement in the murder. He admitted making several false statements in previous interviews. Consistent with his later testimony, Phillips admitted that he and Mathis killed Kitterman. He claimed that as they waited outside of Kitterman's house, Mathis offered him money "to tax the snitch" and more "if we had to take someone out." Pet. App. at 303.

*Interview with Kenneth Clark, Jr.*: Billy Proctor, a now-retired defense investigator, provided a declaration in support of Hirst-Pavek's petition. Proctor previously conducted a phone interview with Kenneth Clark, Jr., while Clark was in prison. During this call, Clark indicated that he and Phillips were housed together in the Okanogan County Jail before Phillips testified at Hirst-Pavek's trial. According to Proctor, Clark knew Danny, but did not know Hirst-Pavek.

Clark told Proctor that while he and Phillips were in jail, Phillips told Clark "that things with . . . Kitterman [were] not supposed to go down the way [they] did." Pet. App. at 318. Phillips said he tried to force himself on Kitterman and "she wasn't having any of it." Pet. App. 318. Clark stated Phillips "sounded like a 'pervert[ed] rapist.'" Pet. App. at 318. Phillips then bragged to Clark in detail about how Phillips "'let her have it.'" Pet. App. at 318. Phillips also bragged to Clark about stabbing Kitterman. Although he

25

told Clark that Mathis was present, Phillips did not say anything about Mathis assisting in the crime.

Proctor declares that he was not able to get a signed declaration from Clark before Proctor retired. Since then, Clark was released from prison and is believed to be living in Okanogan County.

*Sammy Love's Statement*: Sammy Love made a statement to Detective Murry, which was later transcribed. The statement was taken on July 5, 2010, before Hirst-Pavek's trial. Love said:

> I know [Phillips] from Spokane . . . I figured I [would] go see him. I've done a lot of time . . . So I go down there and I see him, and you know how people can shoot the bull . . . I said, "So what's going on here?" . . . And he goes, "Well I lied" . . . And I says, "Well you killed her, right?" And he told me, "Yeah." He says, "I did it." He says, "But I lied to get a better deal," is basically what he told me. . . . And he goes, "Well I was trying to get at the girl, and she wouldn't let me get at it," . . . And I said, "You just fucking lost it," and (inaudible) yeah. . . . basically he told me what happened, and that he stopped out there and they were smoking meth and that he was making advances at this girl and she didn't want nothing to do with him, so he just snapped. So, and that's what he told me.

Pet. App. 307-08. The prosecutor delivered Sammy Love's statement to the defense on October 22, 2010.

*Mathis's Testimony at Her Own Trial*: Hirst-Pavek contends that the above statements by Clark and Love corroborate the testimony of Mathis at her own trial, seven months before Hirst-Pavek's trial. At her own trial, Mathis denied that there was any

plan to tax or harm Kitterman. Instead, she claimed that Phillips spontaneously killed Kitterman when she rejected his advances.

Mathis testified that she met with Kitterman on the night of the murder to recommend that Kitterman stay away from Danny and reassure Kitterman there were other ways to obtain dope. At some point Phillips suggested that they go to the casino. On the way, Phillips asked Mathis to pull onto a side road. Mathis eventually stopped to go to the bathroom. Mathis then saw Phillips reach in and pull Kitterman out of the car. Phillips then began reaching under Kitterman's clothing and assaulting her. Mathis described him as aroused and angry. As Mathis tried to help Kitterman, Phillips told her to "stay out of it." RP (Mathis) at 1861. He then pulled out an ice pick and began stabbing Kitterman. When Mathis came around the car again because Kitterman was screaming her name, Phillips told Mathis that Kitterman "was done for, [and] that [Mathis] couldn't do nothing for her." RP (Mathis) at 1870-71.

Initially, Mathis told law enforcement that she had not witnessed the murder, but admitted at trial that this was not true. Mathis testified she did nothing during the time of the murder and did not physically help Kitterman in any way.

Phillips' testimony at the Mathis/Richards trial was similar to his testimony at Hirst-Pavek's trial. He stated that Richards had approached him about accompanying Richards and Mathis to pick up drugs and possibly "tax" a snitch. RP (Mathis) at 797.

27

Phillips understood he would be paid $1,000 to assault the snitch and $500 if anyone else interfered.

Phillips testified that once they were at Kitterman's house, Mathis told him there could be more money involved, potentially $10,000 "if somebody had to be taken out" and $5,000 for anyone that interfered. RP (Mathis) at 816. He described the attack on Kitterman consistent with his testimony at Hirst-Pavek's trial, indicating after he initially assaulted Kitterman, Mathis began stabbing her with an "ice pick thing." RP (Mathis) at 825. Phillips then finished it at Mathis's request.

Phillips was cross-examined on inconsistent statements he made to police and his cellmates. On cross-examination, Phillips admitted to initially lying to the police when he denied being present and accusing Richards of the murder. Phillips testified that he had said Richards had committed the murder because he heard that Richards had implicated him. Phillips also admitted that he had talked to his cellmates about the murder but that he "told them lies." RP (Mathis) at 849. Ultimately, Phillips admitted that he killed Kitterman.

Phillips also acknowledged he had pleaded guilty to first degree manslaughter, first degree kidnapping, and tampering with physical evidence, and was testifying as part of the plea agreement. He also admitted a prior conviction for burglary.

Richards testified in his own defense. He stated he originally did not know that Phillips had gone with Mathis. When Phillips returned, he pulled Richards into the

bathroom and told Richards what happened and said "it got messy." RP (Mathis) at 1950.

> (iii) *Evidence to Attack the Credibility of Dr. Fino's Trial Testimony*

Hirst-Pavek relies on new evidence to show that Dr. Fino's trial testimony was false. While Dr. Fino's testimony about the gestational development of the fetus was relevant to the manslaughter charge, Hirst-Pavek argues that the prosecutor's use of materially false testimony infected the State's entire case and indirectly undermined the State's evidence relevant to the murder charge.

*Washington State Patrol Crime Laboratory (Lab) Report*: Hirst-Pavek produced a Washington State Patrol (WSP) Crime Lab Report dated March 11, 2010, which concludes that the DNA collected from the placental tissue of Kitterman shows that the fetus was female.

WSP faxed this Lab report to the prosecutor on March 12, 2010. The prosecutor mailed a copy of the report to Hirst-Pavek's defense attorney the same day. The prosecutor also provided Richards's attorney with a copy of the report on March 12, 2010. Although all parties had a copy of the report before trial, it was not admitted at either trial or used by defense counsel to rebut Dr. Fino's testimony.

*Declaration of Dr. John Butt*: Dr. Butt, the defense's expert witness, testified in both Mathis/Richards's and Hirst-Pavek's trial. In his declaration, Dr. Butt states that it was his opinion then, and it remains his opinion, that Kitterman's unborn child had not

29

developed enough to have been felt by Kitterman, and had not developed enough to have definitively determined the sex of the child.

Dr. Butt explains that he read the transcripts of the trial testimony of Dr. Fino. He states that authoritative medical studies conclude that with development of a penis, a male unborn child may be felt moving by the mother as early as 14 weeks. And, because Dr. Fino testified she saw a male penis, she opined that the unborn male-child could have been developed up to 14 weeks. However, the Lab report from WSP established that the sex of Kitterman's unborn child was female. Dr. Fino's testimony that the unborn was male was not accurate and was incorrect.

According to Dr. Butt, "[p]rofessional protocol and standards required Dr. Fino to identify the sex of an unborn child in her autopsy report if the sex could be determined during the autopsy." Pet. App. 136. Dr. Butt had reviewed Dr. Fino's autopsy report and it failed to identify the sex of the baby.

D. Superior Court's Decision

After considering the above evidence, the trial court bifurcated Hirst-Pavek's CrR 7.8 motion. Ultimately the court concluded that Hirst-Pavek's evidence was sufficient to show gateway actual innocence with respect to the manslaughter charge. The court found that while the State had elicited testimony from Dr. Fino that the fetus had likely developed enough to be felt moving by Kitterman based on visible male genitalia, Dr. Fino's testimony that the fetus was male was false and material in light of the WSP Lab

report. Furthermore, because the WSP Lab report was available to both parties, the prosecutor "should have known" that Dr. Fino's testimony was false, and defense counsel was ineffective for failing to use the Lab report to impeach Dr. Fino's testimony. Based on these findings and conclusions, the court vacated Hirst-Pavek's conviction for manslaughter.

The court reached a different result on Hirst-Pavek's murder conviction. The court found that while Hirst-Pavek's new evidence showed she wanted to care for Kitterman's baby and did not intend to harm Kitterman, the evidence introduced at trial of her complicity and planning was overwhelming. The court went on to find that the new declarations did not overcome Hirst-Pavek's own statements and actions pointing toward her guilt and did not show actual innocence of the murder charge. Ultimately, the court concluded that Hirst-Pavek's claim of gateway actual innocence was timely, but that she failed to make a substantial showing that she was entitled to relief or entitled to a factual hearing. The court then transferred the motion on the murder charge to this court for consideration as a PRP.

## ANALYSIS

We must decide whether Hirst-Pavek's petition is time barred. Under RCW 10.73.090(1), a petitioner generally must file a collateral attack within one year after a judgment becomes final. The court of appeals will dismiss a successive petition that is time barred. *In re Pers. Restraint of Bell*, 187 Wn.2d 558, 563, 387 P.3d 719 (2017).

31

Hirst-Pavek acknowledges that her petition is successive and filed more than one year after her conviction became final.

There are several statutory exceptions to the one-year time bar that do not apply here.[5] Nevertheless, Hirst-Pavek maintains that the time limit should be equitably tolled under the gateway actual innocence doctrine. The gateway actual innocence doctrine is a narrow exception to procedural bars where a dismissal of the petition would result in a fundamental miscarriage of justice, i.e., the incarceration of an actually innocent person. *In re Pers. Restraint of Carter*, 172 Wn.2d 917, 923, 263 P.3d 1241 (2011). Under this doctrine, equitable tolling is applied only in circumstances where justice requires. *Weber*, 175 Wn.2d at 256.

As we noted above, when a petitioner meets the gateway actual innocence standard, the court can then consider constitutional challenges that would otherwise be time barred. *Weber*, 175 Wn.2d at 259. In other words, Hirst-Pavek's claim of innocence is not by itself a basis for relief. Instead, the relief she seeks in her petition depends on the validity of her constitutional challenges to the trial below. *Schlup*, 513

---

[5] Under RCW 10.73.100, a petition asserting newly discovered evidence may be exempt from the time bar. However, unlike the new evidence standard for a claim of gateway actual innocence, "newly discovered evidence" under the statutory exception is evidence that was discovered after trial by the exercise of due diligence. *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 13, 513 P.3d 769 (2022). Hirst-Pavek does not contend that this exemption applies to her petition.

U.S. at 315. The claim of innocence merely provides a gateway for this court to consider these otherwise time barred constitutional claims. *Id.*

The Washington Supreme Court has adopted *Schlup*'s probability standard to determine if a petitioner has presented sufficient evidence to make a threshold showing of innocence. *Weber*, 175 Wn.2d at 259; *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). "Under the probability standard, after evaluating the new reliable evidence in light of the evidence presented to the jury, a court must be persuaded that 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Weber*, 175 Wn.2d at 260 (quoting *Schlup*, 513 U.S. at 327). Another way of viewing this standard is if the new evidence convinces this court that the constitutional violations probably caused the conviction of one who is innocent of the crime. *Shlup*, 513 U.S. at 327.

The probability standard announced in *Schlup* "'is demanding,' and cases satisfying it have 'typically involved dramatic new evidence of innocence.'" *Gable v. Williams*, 49 F.4th 1315, 1322 (9th Cir. 2022) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 401, 133 S.Ct. 1924, 185 L. Ed. 2d 1019 (2013); *Larsen v. Soto*, 742 F.3d 1083, 1095-96 (9th Cir. 2013)). The probability standard is higher than that needed to show prejudice and lower than clear and convincing evidence. *Schlup*, 513 U.S. at 327. Still, it is a demanding standard that is rarely met. *House*, 547 U.S. at 538.

The probability standard considers the evidence from the perspective of a reasonable, properly instructed juror. *Weber*, 175 Wn.2d at 258. "To be credible, a gateway actual innocence claim requires the petitioner to support [her] allegations with new, reliable evidence." *Id.* "New evidence in this context does not mean 'newly discovered' but rather 'newly presented' evidence." *Id.* at 258-59 (quoting *Schlup*, 513 U.S. at 332) (O'Connor, J., concurring). This may include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Weber*, 175 Wn.2d at 258.

Under *Schlup*, a reviewing court must consider all the evidence, the total record, old and new, incriminating and exculpatory. *Bell*, 547 U.S. at 538; *Weber*, 175 Wn.2d at 250. The reviewing tribunal "is not bound by the rules of admissibility that would govern at trial." *Schlup*, 513 U.S. at 327. "Instead, the emphasis on 'actual innocence' allows the [court] to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Id*. at 327-28. In doing so, "the [reviewing] court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." Id. at 332.

Although we consider a broad array of evidence under the probability standard, we keep in mind that a showing of actual innocence is more than "showing that a reasonable doubt exists in the light of the new evidence." *Schlup*, 513 U.S. at 329. It is not enough that we find reasonable doubt. *Id.* Nor should we attempt to determine what actually

happened. *House*, 547 U.S. at 538. Instead, we must "assess the likely impact of the evidence on reasonable jurors." *Id*. Ultimately, we must determine, on a more likely than not basis, in light of all the evidence, whether no reasonable juror would have found the defendant guilty. *Schlup*, 513 U.S. at 329.

1.      WHETHER THE TRIAL COURT APPLIED THE CORRECT STANDARD

As a preliminary matter, Hirst-Pavek contends that the trial court applied the wrong standard in reviewing her gateway actual innocence claim. She argues that the court incorrectly applied the standard for assessing the sufficiency of evidence instead of the probability standard. We disagree.

The probability standard is different from review for substantial evidence when a defendant challenges the sufficiency of the evidence. Our review for sufficiency of the evidence considers the evidence in a light most favorable to the State to determine if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Under the probability standard, a "showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." *Schlup*, 513 U.S. at 331. Instead, because a claim of actual innocence is based on evidence not considered by the fact-finder, the reviewing court must assess how the jury would react to the newly supplemented record. *House*, 547 U.S. at 538. This may

require the reviewing court to make credibility assessments or determine if the new evidence calls into question the credibility of the testimony at trial. *Schlup*, 513 U.S. at 330.

Here, the trial court, in its oral decision, set forth the relevant standards as elucidated in *House*, *Schlup*, and *Weber* before applying this standard to the evidence in this case. Pet. Supp. App. at 413. While acknowledging its own struggle with this standard, the court indicated that Hirst-Pavek's attorney had properly directed the court that it should focus on the impact of the new evidence on a reasonable juror as opposed to attempting to determine what happened. Pet. Supp. App. at 413. This was the correct standard.

While we conclude that the trial court applied the correct probability standard, we agree with the State that the court incorrectly applied the gateway actual innocence doctrine within the framework of Hirst-Pavek's CrR 7.8 motion and the time restrictions of RCW 10.73.090. Under CrR 7.8(c), a trial court must transfer a motion for relief from judgment to this court as a PRP unless the court first determines that the motion is not time barred. Even when the court determines that the motion is not time barred, the court may retain the motion only if it also concludes that either an evidentiary hearing is necessary or the defendant has made a substantial showing that she is entitled to relief. CrR 7.8(c)(2).

Here, the trial court made several findings that Hirst-Pavek's evidence did not demonstrate gateway actual innocence with respect to the murder conviction. Resp. Supp. Br. at 217. Nevertheless, the court concluded that "Hirst-Pavek's claim that she meets the gateway actual innocence threshold is not time barred by RCW 10.73.090 pursuant to . . . *Weber*, 175 Wn.2d 247." Supp. Br. of Resp't (Appendix D) at 72. The court went on to conclude that Hirst-Pavek had not made a substantial showing that she is entitled to relief or entitled to a factual hearing pursuant to CrR 7.8(c). *Id.*.

As we noted above, Hirst-Pavek's claim of gateway actual innocence is not a separate basis for relief. Instead, a threshold showing of actual innocence tolls the time limit. *Weber*, 175 Wn.2d at 255-56, 257. Thus, it is incorrect to say that her claim of actual innocence is not time barred. Instead, if Hirst-Pavek fails to demonstrate gateway actual innocence, the constitutional claims she raises in her motion are time barred.

While the court misapplied the gateway actual innocence doctrine within the CrR 7.8 framework, both parties here present argument on application of the doctrine and we proceed to consider whether Hirst-Pavek demonstrates gateway actual innocence so as to avoid the procedural time bar.

2.      APPLICATION OF GATEWAY ACTUAL INNOCENCE DOCTRINE TO THE NEW
        EVIDENCE

Hirst-Pavek contends the new evidence she presents satisfies the probability standard and allows her to pass through the gateway actual innocence. Before we review

Hirst-Pavek's evidence, it is helpful to consider several cases that demonstrate the appropriate application of the probability standard.

In *House*, the defendant was convicted of murdering an acquaintance. *House*, 547 U.S. at 521, 525. The central issue at trial was the identity of the perpetrator. *Id.* at 540. In his petition, the defendant presented newly available DNA evidence establishing that semen on the victim's clothing came from the victim's husband, and not the defendant. *Id.* This contradicted testimony at trial that the defendant could be the source of the semen given his blood type. *Id.* at 529. Further evidence credibly challenged the integrity of forensic evidence including the victim's blood found on the defendant's pants. *Id.* at 541-42. Finally, several witnesses came forward describing suspicious behavior by the victim's husband along with a drunken confession. *Id.* at 549. While acknowledging that the defendant had not demonstrated conclusive proof of innocence, the court concluded that he had put forward substantial evidence that called into doubt the central evidence used to convict him. *House*, 547 U.S. at 553-54.

In *Weber*, the defendant was convicted of assault and attempted murder for shooting the victim at a party. 175 Wn.2d at 247. The primary issue at trial was the identity of the shooter. *See id*. at 253-54. The victim recognized the defendant from a prior contact, knew he went by the moniker "Guero Loco" or "Boxer," and described him as having a shaved head and a "206" neck tattoo. *Id.* at 250, 252. The victim told police

that during an argument, Guero Loco pulled out a gun, chased the victim out of the apartment, and began shooting as the victim drove away. *Id.* at 250.

The defendant, who was known to go by "Weta Loco," was arrested later the same day driving a gray sedan that contained evidence linked to the party host. *Id.* at 250-51. The victim selected the defendant from a photo montage with 80 percent certainty. *Id.* at 251. At trial, the victim testified that the shooter loaded the gun with his right hand while holding it in his left hand. *Id.* at 252-53. A neighbor testified that after she heard gunshots, she watched the victim drive away in an SUV, followed by a gray sedan similar to the petitioner's. *Id.* at 253. The petitioner's cousin originally testified that he was with her all night, but later indicated that he left twice and returned. *Id.*

The defendant filed a successive petition, presenting new evidence suggesting that he was misidentified, and arguing that the time bar should be tolled under the gateway actual innocence doctrine. *Id.* at 255-56, 261. The Supreme Court adopted *Schlup*'s probability standard for gateway actual innocence claims related to a conviction. *Id*. at 259.

The new evidence included the defendant's booking photo, showing him with dark hair, half-inch long. *Id.* at 260. The defendant also produced declarations by two experts, one questioning the reliability of the victim's identification and the other questioning the right-handed defendant's ability to shoot with his left hand. *Id.* at 261. The Supreme Court found these declarations failed to meet the heightened probability

standard, noting that the victim's identification was reliable because he recognized the defendant and was able to give an accurate description. *Id*. at 262. The court also discounted the testimony of the firearm's expert, noting that the victim could be wrong about which hand the shooter used and the expert did not negate the defendant's ability to shoot with his left hand. *Id*. at 261-62.

The defendant also produced declarations from witnesses who claimed to be at the party. *Id.* at 261-62. Two witnesses stated that another person at the party matched the description and went by "Guero Loco" or "Boxer." *Id.* at 261. The court noted that even if true, the declarations did disprove the defendant's presence at the party. *Id*. at 261-62. Finally, the petitioner presented the declaration from a witness who knew the defendant, and was "positive" that he was not at the party. *Id*. at 262. The court discounted the credibility of this declaration, noting that unlike declarations from uninterested persons, this witness was a lifelong friend of the petitioner. *Id*. at 262.

Ultimately, the court concluded that the petitioner's evidence did not overcome the evidence that both the petitioner and the shooter had neck tattoos with "206," both drove a gray sedan, and the defendant's vehicle contained evidence linked to the party host. *Id*. at 250-51. In sum, the court was not persuaded that it was more likely than not that no reasonable juror would have found the defendant guilty. *Id*. at 262-63.

More recently, in *Kozol*, Division One concluded that the defendant's new evidence failed to meet the probability standard. *In re Pers. Restraint of Kozol*, 30 Wn

App. 2d 548, 562, 547 P.3d 260 (2024). There, the defendant was charged with attempted first degree murder and first degree burglary for an attack on his former roommate after police found evidence in the defendant's home linked to the burglary. *Id.* at 551-553. At trial, the petitioner testified that he was not involved and provided an explanation for the evidence. *Id.* at 553. Both he and his girlfriend testified that they were together at her apartment the entire night of the attack. *Id.*

To overcome the procedural time bar on his successive petition, the petitioner argued that new evidence demonstrated gateway actual innocence. *Id.* at 561-62. Specifically, he proffered the declaration of his neighbor at the time of the attack who stated that she not only saw the defendant walking his dog on the night and at the time of the attack, but stopped and talked with him. *Id.* at 561-62. The court found this declaration was not credible. *Id.* Not only did the declaration contradict the defendant's testimony at trial, but the timing of the declaration—two decades after the events— undermined its credibility. *Id.* at 562. The court also rejected as not credible an anonymous letter to the newspaper, claiming responsibility for the attack. *Id.* Finally, the *Kozol* court rejected the defendant's argument that the State withheld evidence of past misconduct of a detective in violation of its disclosure requirements under the *Brady*[6] rule, noting that the petitioner failed to cite any authority that evidence of a *Brady* violation could be used to prove a gateway actual innocence claim. *Id.* at 563.

These cases collectively confirm that we must be convinced, on a more probable than not basis, that the new evidence is credible and substantially undermines the State's evidence at trial to the point where we conclude that no reasonable juror would have found the petitioner guilty. With this standard in mind, we turn to the evidence in this case, both old and new.

### A. Declarations Regarding Hirst-Pavek's Intentions

Hirst-Pavek asserts that reasonable jurors would be influenced by new declarations averring that shortly before the murder Hirst-Pavek had a change of heart about Kitterman and her pregnancy, had abandoned any intent to harm Kitterman or the baby, and was committed to raising the baby if Kitterman was unable to do so. Besides her own declaration, she provides declarations from five witnesses who would be willing to corroborate this change in attitude from anger to acceptance. Other than McClure, none of these witnesses testified at trial.[7] In addition, she points to Corporal Hill's statement that Hirst-Pavek was worried about the well-being of Kitterman's baby, arguing this testimony corroborates her newly presented witness statements. These declarations are unconvincing as they are not credible, provide cumulative evidence, and fail to overcome the evidence of Hirst-Pavek's culpability, including her confession following Kitterman's murder.

---

[6] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
[7] With the exception of Hirst-Pavek who has a constitutional right not to testify.

Not only does the late timing of these declarations undermine their credibility, but so does the declarants' relationship with Hirst-Pavek. *See Weber*, 175 Wn.2d at 261-62 (in assessing new evidence for purposes of a gateway actual innocence claim, court found declaration of petitioner's friend, claiming that petitioner was not at party where shooting occurred, to be less credible than a declaration from an uninterested person); *Kozol*, 30 Wn. App. 2d at 562 (court found that timing of declaration, submitted almost two decades after crime in support of gateway actual innocence claim, was less credible).

Even if we were to accept these declarations at face value, the declarations are cumulative to similar evidence introduced at the trial and do not demonstrate that Hirst-Pavek had completely abandoned other options for taking care of the problem created by Kitterman's pregnancy. Numerous witnesses testified that Hirst-Pavek made threatening remarks about wanting to see Kitterman harmed or that she had hired people to harm her. However, there was also testimony that Hirst-Pavek expressed a desire to raise the child with her husband. Perhaps the best example of her thought process was Hirst-Pavek's own statement to police during her second interview, when she described her feelings toward Kitterman:

> I have also said that I was willing to help him raise that child as well, you
> know, if she chose to have it. My biggest concern is that she was doing
> drugs and I didn't want to see her or him have a fucked up kid. I mostly
> didn't want to see Danny have a fucked up kid and that was why I'd made a
> lot of phone calls to, you know, get her pulled over and what have you.

43

RP (Hirst-Pavek) at 1457.  Hirst-Pavek went on to explain that her "biggest concern was that either the baby was healthy or [Kitterman] was, you know, out of the picture."  RP (Hirst-Pavek) at 1457.

Hirst-Pavek's statement shows that she simultaneously considered either scenario as a viable option to the problem posed by Kitterman's pregnancy.  In other words, even if we were to find these declarations credible, any statements by Hirst-Pavek about raising the child do not exclude her alternative solution.

Finally, any evidence suggesting that Hirst-Pavek had abandoned any intention to harm Kitterman is undermined by other evidence including Hirst-Pavek's own statements.  On the day of the murder, knowing that Mathis was going up to see Kitterman, Hirst-Pavek called a friend to see if Kitterman was at the house and explained to this person that "it would all be handled by Monday."  RP (Hirst-Pavek) at 605.  After Kitterman was murdered, Hirst-Pavek admitted to detectives that "the truth was that she wanted [Kitterman] gone and the baby dead . . . that Mathis had asked her if this is what she wanted, and she said it was."  RP (Hirst-Pavek) at 1483.

As the trial court found, the declarations from friends claiming Hirst-Pavek had a change of heart did not overcome the overwhelming evidence that Hirst-Pavek was complicit in the murder.

        B.      *The Washington State Patrol Crime Laboratory Report and Dr. Fino's Testimony*

At trial, Dr. Fino testified that Kitterman's unborn child had developed to the point where male genitalia was visible, and was thus developed enough to be a quick child. The Lab report refuted her testimony by making it clear that the fetus was female.

According to Hirst-Pavek, Dr. Fino's false testimony effectively calls into question the reliability of the entire case against Hirst-Pavek, including her conviction for murder. She argues that a reasonable juror would conclude that the prosecutor's use of materially false testimony was calculated to obtain a conviction despite the truth contained in the Lab report and would call into question the credibility of the State's entire case.

Hirst-Pavek's argument is based on the premise that the new evidence includes evidence that the State knowingly promoted false testimony. Not only is there no evidence that the State actually knew Dr. Fino's testimony was false, but the State's motive is not evidence.

The trial court found that the Lab report was provided to the State and defense prior to trial but neither party used the report during testimony. The court also found:

> the prosecution purposely elicited testimony from Dr. Fino that the sex of
> the child could be determined because the genitalia, including a penis,
> could be seen by Dr. Fino and in the autopsy photographs. This testimony
> is contrary to direct scientific DNA evidence that the fetus was, in fact, a
> female. This evidence is material to the determination of whether the fetus
> was a quick child. It is clear from the testimony of Dr. Fino and of Dr. Butt
> that neither expert had been provided with the March 11, 2010, WSP Lab
> report by the prosecution or by defense counsel.

45

No. 39100-1-III
*In re Pers. Restraint of Hirst-Pavek*

State's App. at 80.

The court went on to find that the prosecution "should have known" Dr. Fino's testimony, that the fetus had visible male genitalia, was false. In reaching Hirst-Pavek's constitutional claims, the court concluded that she was deprived of her right to a fair trial and due process by the introduction of false testimony and denied the right to effective assistance of counsel because her attorney did not use the Lab report to impeach Dr. Fino.

Contrary to Hirst-Pavek's argument, there is no evidence or finding that the State knowingly presented false testimony. Purposely eliciting testimony that turns out to be false is different than purposely eliciting false testimony. The trial court concluded that the State should have known that Dr. Fino's testimony was false, just as it concluded that defense counsel was ineffective for failing to use the Lab report to refute Dr. Fino's testimony. In other words, both sides were negligent for failing to recognize the significance of the Lab report.

For the same reasons, Hirst-Pavek's reliance on *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 276 P.3d 286 (2012) is misplaced. As the State points out, *Stenson* is a *Brady* violation case and here there is no evidence or finding of a *Brady* violation. Even if there was, similar to the petitioner in *Kozol*, Hirst-Pavek fails to cite any authority that evidence of a *Brady* violation can be used to support a claim of gateway actual innocence. *Kozol*, 30 Wn. App. 2d at 563.

Finally, we disagree with Hirst-Pavek that Dr. Fino's testimony in the trial of codefendants Mathis and Richards is relevant or would persuade the jury in Hirst-Pavek's trial. The trials were separate and the evidence was separate. Hirst-Pavek's contention that jurors in her trial were somehow influence by evidence introduced in another trial is not supported by the record.

The WSP Lab report most likely falls within the definition of "exculpatory evidence" with respect to the manslaughter charge. Based on this new evidence, the superior court concluded that the report and proof that Dr. Fino's testimony was false satisfied *Schlup*'s probability standard as it related to Hirst-Pavek's conviction for first degree manslaughter–quick child. The superior court's order vacating the manslaughter conviction is not before us.

Otherwise, however, Hirst-Pavek fails to demonstrate that the WSP Lab Report or Dr. Fino's testimony would impact a jury's assessment of the evidence relevant to the murder charge.

### C. *New Evidence Regarding Phillips*

Hirst-Pavek contends that Phillips was the only witness who testified that the murder was a pre-planned, for-hire hit on Kitterman. She asserts that new evidence undermines the credibility of Phillips's testimony. Additionally, she claims that he credibly confessed to acting alone in killing Kitterman, which would negate Hirst-Pavek's complicity. The new evidence consists of inconsistent statements by Phillips

47

during the initial investigation, and hearsay statements by Love and Clark that Phillips confessed to acting alone in killing Kitterman. The State counters that Phillips's testimony was not a crucial link and the new evidence does not meet the probability standard. We conclude that the new evidence is cumulative, not credible, and does not exculpate Hirst-Pavek's involvement in the murder. Therefore, it fails to demonstrate gateway actual innocence.

The evidence that Phillips told police multiple different versions of the murder is not new evidence. Phillips's preliminary statements were provided to defense counsel who used them to thoroughly cross-examine Phillips who in turn admitted lying to police on multiple occasions. This is not a situation where the petitioner learns after trial that a key prosecution witness was a habitual liar with a history of blaming others for his crimes. *See Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997).

Moreover, Phillips's alleged confessions to Clark and Love do not undermine the State's case or our confidence in the conviction. *Gable*, 49 F.4th at 1322. The alleged confessions are not sufficiently reliable, are not supported by other evidence, and do not cast serious doubt on Hirst-Pavek's guilt. *See id*. at 1323.

The statements by Love and Clark are not inherently reliable. As presented, these statements are double and triple hearsay. Phillips apparently confessed to Clark, who then retold the story to the investigator, who then provided a declaration to the court. Likewise, Phillips confessed to Love, who then provided a statement to investigators.

48

Other than the investigator's declaration, none of the statements or confessions were provided under oath. In addition, Love's statement was available to counsel before trial and is not new; and Phillips's statement to Clark was made while Phillips was admittedly "shoot[ing] the bull" and "bragg[ing]." Pet. App. at 307; 318. While we are not bound by the rules of admissibility, we are directed to consider whether the evidence is reliable and credible. *Schlup*, 513 U.S. at 327-28. Hearsay evidence is generally not admissible because it "is extraordinarily difficult to challenge because the person who made the statement is not in court, not under oath, and not subject to cross-examination." *In re the Dependency of A.C.*, 1 Wn.3d 186, 188, 525 P.3d 177 (2023).

Even taken at face value, the statements by Clark and Love do not rule out the involvement of Mathis and Hirst-Pavek. Contrary to Hirst-Pavek's characterization, neither Clark nor Love claimed that Phillips confessed to acting alone. Clark told the investigator that Phillips admitted that things were not supposed to go down that way and bragged about letting her have it when she rejected him. And while Phillips apparently told Clark that Mathis was present, he did not say anything about Mathis stabbing Kitterman. Likewise, Love told police that Phillips said he lied to get a better deal without explaining how he lied. While these statements could suggest that Phillips acted alone, they do not necessarily rule out a pre-planned attack or Mathis's involvement.

Nor is Phillips's alleged confession supported by other evidence. Hirst-Pavek contends that Phillips's description of the murder weapon as a 3-sided file rather than an

49

ice pick was a detail supporting his confession. She argues that Phillips was the only person who knew what was used to kill Kitterman and confirms his confessions. But this argument is unconvincing. The difference between an ice pick and a 3-sided file is minimal. It is undisputed that Phillips killed Kitterman with a weapon that resembled them both. The fact that Mathis testified that the murder weapon was an ice pick does not discount that she might be mistaken and does not rule out that she herself used the weapon to inflict injuries.

Hirst-Pavek also argues that Phillips's confessions to Clark and Love, that he killed Kitterman for rejecting his sexual advances, is similar to Mathis's testimony at her trial. Hirst-Pavek argues that since Clark, Love, and Mathis do not know each other, their independent statements corroborate each other. We disagree. As noted above, Phillips's statements to Clark and Love did not declare, as Mathis testified, that he acted alone and spontaneously killed Kitterman. Moreover, Mathis's testimony at her own trial was not credible. Not only was it self-serving, but her testimony was contradicted by other evidence.

Even if a jury were to hear Phillips's confession that he alone killed Kitterman because she spurned his sexual advances, Hirst-Pavek does not show that no reasonable juror would have found her not guilty beyond a reasonable doubt. As the trial court noted, the evidence of Hirst-Pavek's complicity was overwhelming. Hirst-Pavek admitted to police that Mathis had agreed to take care of the baby problem and admitted

that she provided the vehicle to help Mathis make this happen.  The shallow wounds on Kitterman's abdomen differed from the deep wounds on other parts of her body, thus supporting Phillips's trial testimony that Mathis stabbed Kitterman several times in the stomach.  Mathis confessed to Hohman that she and Phillips were being paid to attack Kitterman, and Mathis attempted to cover up the crime by cleaning the vehicle and soliciting the murder of Phillips.

There is little doubt that Phillips inflicted Kitterman's lethal blows.  But the State charged Hirst-Pavek as an accomplice to the murder, which required the State to prove that Hirst-Pavek solicited, commanded, encouraged, requested, aided or agreed to aid another person to commit the crime.  To pass through the gateway actual innocence, Hirst-Pavek must show that the evidence demonstrates that it is more likely than not that no reasonable juror would have found her guilty beyond a reasonable doubt.  On this record, Hirst-Pavek has not shown that any of the three categories of new evidence helps her pass through the gateway.  Because Hirst-Pavek cannot meet the probability standard for gateway actual innocence, she fails to show that her constitutional claims were tolled.

No. 39100-1-III
*In re Pers. Restraint of Hirst-Pavek*

We dismiss Hirst-Pavek's PRP as successive and untimely. *Bell*, 187 Wn.2d at

563.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, C.J.